516 P.2d 42

**The STATE of Arizona, Appellee,**

v.

**Neal E. THOMPSON, Appellant.**

No. 2631.

Supreme Court of Arizona,
In Division.

Nov. 20, 1973.

Gary K. Nelson, Atty. Gen. by Frank Sagarino and Grove M. Callison, Phoenix, Asst. Attys. Gen., and Richard M. Davis, Special Counsel, Tucson, for appellee.

Evans & Storrs, P. C. by Randall L. Evans, Phoenix, for appellant.

CAMERON, Vice Chief Justice.

This is an appeal from jury verdicts and judgments of guilt to three counts of sale of narcotic drugs (heroin), § 36–1002.02 A.R.S., together with concurrent sentences of not less than fifteen years nor more than life imprisonment on each count.

We are asked to answer the following questions on appeal:

1. Was the defendant prejudiced by unresponsive statements made by State's witnesses which allegedly put defendant's character in issue?

2. Was the county attorney guilty of prejudicial misconduct in cross-examining a defense witness about an Arizona felony conviction that did not exist?

3. Was the defendant prejudiced by the county attorney cross-examining him about prior misconduct not amounting to a felony?

4. Was the sentence excessive?

The facts necessary for a determination of this matter on appeal are as follows. Robert Dale Jackson, a known user of narcotics who admittedly supported his habit by committing crimes of burglary, was prevailed upon by the Phoenix City Police to act as a purchaser of heroin in the West Buckeye area of Phoenix, Arizona. Jackson's automobile was fitted with some boxes in the back seat in which a member of the Phoenix Police Department hid. A microphone was placed in the automobile and Jackson's conversations were recorded on tape. In his capacity as a purchaser for the City of Phoenix, Robert Dale Jackson allegedly made four purchases of heroin from the defendant Neal E. Thompson during the month of May 1972. Based on this information, the police arrested the defendant charging him with four counts of sale of narcotic drugs.

At the trial the defendant took the stand and testified in his own behalf. His defense was that he had merely been holding the heroin as collateral for money Jackson owed him and gave the heroin to Jackson whenever Jackson made payments on the loan. The defendant Thompson testified:

"A  Yeah. Well, like I said, I knew he was a pretty good hustler so therefore I already knew what he was pretty well doing. And he said a detective was after him for about a burglary, some burglaries that he had been pulling. Well like I said, I knowed what he was, shooting dope, and all the rest of the stuff about him.

"Q  Now, Mr. Thompson, at this time did you ask him for the money he owed you?

"A  Sure.

"Q  What did he say?

"A  Well he didn't have any money at that particular time but he had

some dope that he had bought on a deal from some guy that he had been dealing with. So he wanted to leave it with me as collateral.

"Q What happened next?

"A So I kind of hesitated about it for a while but—

"Q What was the arrangement, if any, that you made with Mr. Jackson?

"A After he would hustle—after he would go and get stealing the merchandise or however he wanted to get his business, the money, through making his money, you know, that he would pay me so much and then he would go and when he got ready to sell some of the merchandise that he had, well he would bring me money in exchange for his dope.

\*    \*    \*    \*    \*    \*

"Q Did he ever tell you he had some problems with his family at home?

"A Sure. Well he told me that his wife had been on him about, you know, shooting the drugs and stuff and that she didn't want to keep the stuff around the house, especially during the latter part—at this particular time because she thought that detectives were going to come out, you know, and she didn't want them to find it at the house.

"Q So what happened then?

"A He brought it down. Like I say, we made an arrangement. He brought it down to me.

\*    \*    \*    \*    \*    \*

"Q What would Mr. Jackson tell you to do?

"A He would come down and say, 'Well, I need a bag or a couple of bags' or whatever he wanted.

"Q What was he referring to?

"A Well, the bags of heroin, I suppose.

"Q Whose bags were those?

"A His.

"Q And what would happen then?

"A Well, like I said, I would have to have time, you know, to go get them. I didn't keep anything with me. And he said, 'Well, all right, I'll come back' because see, down there is very few white people come down and if the police see them around, they get jacked up right away. So he would leave and he would come back."

The jury evidently did not believe the defense interposed by the defendant and found him guilty on three counts of sale of narcotic drugs. After a hearing in mitigation, the trial court imposed a sentence of fifteen years to life on all three counts to run concurrently. From the verdicts, judgments, and sentences the defendant appeals.

## UNRESPONSIVE STATEMENTS OF STATE'S WITNESSES

Defendant contends that several statements made by officers were prejudicial to the defendant as being unfair innuendos and inferences that defendant was "a vicious and dangerous person involved in numerous heroin dealings and thefts." The defendant cites as an example the testimony of Officer Tyron:

"Q Were you employed as a narcotics officer on May 10 of 1972?

"A Yes, sir, I was.

"Q Directing your attention to that date at approximately 10:00 p. m., did you have occasion to come in contact with one Robert Dale Jackson?

"A Yes, sir, I did.

"Q What was the purpose of contacting him at that time?

"A He was a confidential and reliable informant of mine, and at this time we were putting a plan into effect to buy street heroin from heroin dealers on the West Buckeye Road area."

**168**

And:

"Q * * * Was there some agreement between Mr. Jackson and the police department which resulted in him cooperating with you in the sales that you have testified to?

"A We helped him out of a burglary charge at one other time prior to us wrapping up and completing the sales on Buckeye Road."

And on cross-examination by defendant's attorney:

"Q Are you telling the ladies and gentlemen of the jury that you and Officer Tryce decided to let him out to commit burglaries so he could give you information about other crimes?

"A No, sir.

"Q You just talked about the possibility?

"A (No response.)

"Q Let me strike that question. In other words, you were leaving him out of jail so that you could use him to catch other lawbreakers even though he was breaking the law and you realized that?

"A More serious lawbreakers.

"Q I see. Okay. Do you recall how long Mr. Jackson had been in jail on April 25 when you talked to him?

"A About a week.

"Q And did you ask Officer Tryce why he arrested your informant?

"A Yes, sir.

"Q Did he tell you he just couldn't leave the guy out any longer?

"A Said he got a warrant for his arrest.

"Q Did that upset you?

"A Somewhat, yes, sir. Because we were doing better things with Mr. Jackson; I think that people of a more serious nature, people that would be more harmful to the City of Phoenix than somebody—"

And on further cross-examination:

"Q BY MR. EVANS: Would you tell the ladies and gentlemen of the jury why you just put quote, to use your words this morning, a hold on those traffic warrants instead of being completely wiped out for the man?

"A If the person or informant is working for the Police Department, we'll help the man and thus put in a more dangerous or more vicious person in jail—

"Q Officer, would you be responsive to the question. You're not being responsive.

My question is to you: You tell those ladies and gentlemen of the jury why you kept a quote, to use your words, a hold on those traffic warrants instead of dismissing them completely?

"A Because we didn't have time to get them dismissed completely at the time. Subsequently we have had them dismissed."

And:

"Q Why would he be allowed to plead to a lesser charge?

"A Due to the fact that he was helping us put worse people in jail.

"Q Did he know that?

"A Sure, he knew it."

■ From the beginning of the trial defendant's attorney attempted to show and did show that Jackson was a drug addict who committed burglaries to support his habit and that he was given preferred and preferential treatment in return for making the buys in the instant case. While some of the answers appear to be unresponsive, viewing the testimony as a whole, they were, nevertheless, responsive to the full range of the facts and issues in the case. Against the allegation by the defense that the police were allowing Jackson to remain at large and continue his criminal activities, the police should be allowed to show why they did in fact allow Jackson to remain free. Also it is noted the most dam-

aging answers were made in response to defendant's questions on cross-examination. We have stated:

> "On cross-examination, Agent Saez testified that he had marked the money given to the defendant in exchange for the marijuana. Defense counsel asked the agent why he had not arrested defendant when the sale took place, so as to take advantage of the use of the marked money. Agent Saez replied 'I eventually want the complete nucleus of the narcotic traffic. I don't want just one lieutenant * * *.'
>
>     *     *     *     *     *     *
>
> "Defense counsel asserts that 'Just because counsel asked "why" does not give a federal agent with many years experience in narcotics cases and trials the excuse to answer in any way he pleases.' With this general statement we agree. But where an answer is clearly responsive to the question asked concerning the facts surrounding the commission of a criminal act and failure to make an immediate arrest, it falls within the 'invited error' rule and defendant may not be heard to object, when the answer is unfavorable." State v. Maggard, 104 Ariz. 462, 464–465, 455 P.2d 259, 261–262 (1969).

## MISCONDUCT OF THE COUNTY ATTORNEY

One of defendant's witnesses was called to testify as to the character of the State's star witness Jackson. On cross-examination by the county attorney the following took place:

> "Q Mr. Arney, have you ever been convicted of a felony?
>
> "A Yes, I have, when I was 19 years old.
>
> "Q Where was that?
>
> "A In San Francisco, California.
>
> "Q Have you ever been convicted of a felony in Arizona?
>
> "A No, sir.
>
> [The defendant objected and was overruled.]

### REDIRECT EXAMINATION
"BY MR. EVANS:

> "Q Jim, have you ever been convicted of a felony in Arizona that you are aware of?
>
> "A No."

The defense then moved for a mistrial because it appeared that in fact Mr. Arney had never been convicted of a felony in Arizona. The attorney for the State responded, "According to my associate, the proof is on the way over now, a certified copy of a court record." The motion to strike was denied. At the post-trial motions the county attorney stated:

> "As to the question of Mr. Arney's prior conviction in the State of Arizona, first let me state that the State had no indication that Mr. Arney would be called as a witness until, I believe, he and Miss Morgan were sworn.
>
> "At that time one of the police officers went down to the police station, the west end, same building, got a copy of his rap sheet. It was from this rap sheet that I made the avowal that we were attempting to obtain a copy of his Arizona conviction based upon an entry on that.
>
> "As it turns out our information is that it was not a conviction or even an arrest in Arizona. It was merely his registering in Arizona as a result of being placed on probation from a Court in California. I believe that he admitted that prior; some sort of out of state probation worked out and the entry on the rap sheet, the entry in Phoenix, Arizona was his registering here.
>
> "On the rap sheet it did appear as if there had been an arrest in this state. Further, after we had that information then Mr. Gregor proceeded to our office and to the Clerk's office in an attempt to locate a prior, and in fact there was none in Arizona."

While it is improper to ask a witness if he has a prior felony conviction unless the person asking the question is prepared to prove it after a negative an-

swer, State v. Stago, 82 Ariz. 285, 312 P.2d 160 (1957), under the facts in the instant case we find no lack of good faith on the part of the attorney for the State or prejudice to the defendant. If the witness had been impeached by the one felony conviction he readily admitted, we cannot say that the denial of the alleged Arizona conviction was not also believed by the jury. We find no prejudicial error.

## COUNTY ATTORNEY'S CROSS–EXAMINATION ABOUT PRIOR MISCONDUCT NOT AMOUNTING TO A FELONY

The defendant made a motion in limine to restrict the county attorney from inquiring into specific acts of prior misconduct or bad acts of the defendant not amounting to a felony. The court first denied the motion in limine, but later ruled that admission of these acts was not permissible. Concerning the arrangement of holding Jackson's heroin as collateral, the county attorney asked the defendant as follows:

"Q Have you ever had any similar arrangements with any other people where they owed you money or they were having trouble around their house and they would ask you to keep heroin for them or give you heroin as collateral on a debt owed you?

"A Not heroin but they have given me other things as collateral.

"Q Well, any contraband? By contraband I mean any illegal substance?

"MR. EVANS: If it please the Court, I would object at this time. The question is improper.

"THE COURT: Sustained.

\*    \*    \*    \*    \*    \*

"Q BY MR. PARKS: Did you have any other arrangements similar to this with Mr. Jackson at any prior time?

"A No, I never fixed his car before.

"Q This is the only time that he owed you money is when you fixed his car?

"A As far as I can remember."

The county attorney also asked defendant concerning terms and words used by drug users and dealers, to which the defendant expressed a general ignorance. For example:

"Q BY MR. PARKS: Did you hear Mr. Jackson testify that to cop, meant to buy heroin?

"A Did I hear him say that and admit to buy heroin?

"Q No. Did you hear Mr. Jackson testify that to cop, the expression to cop, meant to buy heroin?

"A I don't think he said that.

"Q Have you ever heard the expression to cop?

"A Yes, I've heard it.

"Q And what did you understand it to mean?

"A I didn't even give it no thought.

"Q How many times would you say you have heard the expression, 'to cop'?

"A I don't know.

"Q More than once?

"A It's possible."

◼ While it is true that prior bad acts not amounting to a felony may not be used to prejudice a defendant in a particular trial, this does not apply to acts which possess independent relevancy for some purpose as to the crime for which the accused is on trial. State v. Ballesteros, 100 Ariz. 262, 143 P.2d 739 (1966). A defendant who elects to take the stand on his own behalf may be cross-examined as any other witness, § 13–163 A.R.S., and a party is allowed great latitude in cross-examination. State v. Young, 109 Ariz. 221, 508 P.2d 51 (1973). In the instant case the defendant's credibility was being tested as to his knowledge of the drug trade against

his testimony that he knew little or nothing of the drug trade and was merely holding the heroin for collateral. Our Court of Appeals has stated:

"We agree that a witness may be asked questions which have a legitimate tendency to shake his credit even though embarrassing or affecting his character, however, the power to determine the limits of this examination is vested with the trial court to the extent that the trial court's ruling is not grounds for reversal unless the appellant establishes an abuse of discretion which has occasioned prejudice. * * *" State v. Carter, 1 Ariz. App. 57, 63, 399 P.2d 191, 197 (1965).

## WAS THE SENTENCE EXCESSIVE?

At the aggravation and mitigation hearing, the probation report recommended that the defendant be sentenced to five to fifteen years. Judge Coulter stated:

"MR. EVANS: One last thing, may the record reflect that the probation officer, Barry Norris, has recommended a five year minimum sentence?

"THE COURT: It certainly may, counselor, and it also may reflect that his original recommendation was not less than 15 or more than 20, and it is the Court's understanding that after consulting with you, he reduced his recommendation to not less than five nor more than 20 years.

The record may further reflect that the sentence just imposed, counsel was advised of the sentence just imposed prior to the hearing, mitigation hearing and aggravation. Said hearing did not change this Court's view of the appropriate sentence to be imposed."

We have stated:

"The legislature has vested in the trial court broad discretion in sentencing the defendant by setting minimum and maximum statutory periods. Since the trial court generally is better able to evaluate the defendant's crime in light of the particular facts of the case as well as the background circumstances relative to his moral "character, we will not disturb that sentence unless there is a clear abuse of discretion. * * *" State v. Fischer, 108 Ariz. 325, 326, 498 P.2d 147, 148 (1972).

Judgments affirmed.

STRUCKMEYER and LOCKWOOD, JJ., concur.