661 P.2d 1105
**STATE of Arizona, Appellee,**

v.

**Jimmie Wayne JEFFERS, Appellant.**

No. 4253.

Supreme Court of Arizona,
En Banc.

Jan. 24, 1983.
Rehearing Denied April 5, 1983.

Stephen D. Neely, Pima County Atty. by D. Jesse Smith, Chief Deputy County Atty., Tucson, Michael Pearce (Law Student specially admitted under Rule 28(e), Rules of the Supreme Court of Arizona), for appellee.

Richard S. Oseran, Pima County Public Defender, Schotland & Stuehringer, Frank P. Leto, by Donald S. Klein and James W. Stuehringer, Tucson, for appellant.

HOLOHAN, Chief Justice.

Appellant, Jimmie Wayne Jeffers, was found guilty by a jury of first degree murder. Following an aggravation/mitigation hearing, Jeffers was sentenced to death. He now appeals both the conviction and the sentence. We have jurisdiction pursuant to A.R.S. § 13–4031. The judgment of conviction and the sentence are affirmed.

The evidence presented at trial shows that on October 8, 1976, Jeffers was released from jail on an appeal bond following convictions of crimes unrelated to the instant appeal. About a week later he met Doris Van Der Veer at a party given by mutual friends. For the next several weeks Doris lived with Jeffers and became his constant companion.

Doris and Jeffers registered at the Linda Vista Motel in Tucson on October 18, 1976. Jeffers had mentioned his ex-girlfriend Penelope Cheney (Penny) to Doris several times. Doris delivered a note, which Jeffers wrote, inviting Penny to the motel where Jeffers was to provide her with some heroin.

On the day of the murder Jeffers told Doris that Penny was coming over and they wished to be alone. They were going to discuss getting back together. When Penny arrived, Jeffers introduced her to Doris who then excused herself. Doris went to the motel's pool area and sat reading for

about an hour and a half when it began to rain. Doris then went to her car and sat inside listening to her CB radio for about half an hour. She then returned to the motel room and knocked on the door. Jeffers admitted her, pointed a gun at her and instructed her to sit in a chair and be quiet.

Upon entering the motel room, Doris saw Penny lying unconscious on the bed. Jeffers injected a fluid into Penny's hand. He began to swear at Penny and said, "I have given her enough * * * to kill a horse and this bitch won't die." Doris noticed foam coming from Penny's mouth, which she recognized from her training as a nurse to be a sign of heroin overdose. Doris checked Penny's condition and determined that she was still alive. Doris asked Jeffers if he was going to help Penny and he responded, "No, I'm going to kill her."

Jeffers then removed the belt from around Penny's waist and began to choke her with it. He soon discarded the belt and choked her with his bare hands. Doris urged him to stop saying she would probably die anyway, to which Jeffers replied, "No, I've seen her this way before and she's come out of it."

After the strangling Jeffers had Doris take Penny's pulse. She found no pulse and reported that Penny was dead. Jeffers then had Doris inject more heroin into Penny and choke her while he took photographs. Jeffers told Doris he did this to have proof that she was an accomplice. Jeffers struck Penny's body several times before Doris helped him put it in the shower stall, where it remained for three days. They then wrapped the body in newspaper and plastic garbage bags, placed it in a sleeping bag and transported it to a secluded spot near Sedona. There they buried it in a shallow grave.

Appellant has raised a number of issues in this challenge to his conviction and sentence. For clarity the issues have been considered in the order in which they occurred in the proceedings in the trial court.

THE JAIL NOTE

Prior to trial, Jeffers moved to suppress two documents: a handwritten note writ-

ten by him, and a copy of a police report mailed to him while in the Pima County Jail. After a hearing, the court denied the motion, and the items were admitted in evidence. Jeffers contends that the court's failure to suppress this evidence violated his first, fourth, and fourteenth amendment rights.

The evidence at the suppression hearing shows that in August, 1976, before the murder in this case, Jeffers was incarcerated in the Pima County Jail on drug offenses. Jeffers had obtained a copy of a Pima County Sheriff's Office report which stated that in June, 1976, Penny Cheney and another woman had given the sheriff's office information about Jeffers' narcotics connections and his trading drugs for stolen property. Jeffers had underlined the words "Penny Chaney [*sic*] . . . furnished the following information" and wrote beside a list of names on the report, "Patty didn't know any names" and "Penny was only one [*sic*] that knew this."

On August 21, 1976, Jeffers wrote a note (or "kite" as notes between prisoners are called) to one Bobby Norgard, another prisoner who was in a cell approximately 30 feet away. Jeffers testified that he folded the note two or three times, wrote "Bobby" on the outside, attached a copy of the police report, and asked a detention officer, Officer Cleburn, to deliver it to Norgard. After taking the note, Cleburn read it and turned it over to his supervisor. The note offered Norgard "some quick cash" if when he got out of jail he would get rid of Penny and "Fat Boy" (identified at trial as Richard Honton). The note read in part:

Name your price and it will be paid the day after it is in the papers. I want to do it myself but I am not sure they will set bond. If they do it will take a couple of months. I am in a hurry. I don't want her to get out of town. An O.D. would be find. Nice & clean.

Jeffers, another prisoner, and Officer Cleburn testified at the suppression hearing. Their testimony established that the prisoners in the Pima County Jail frequently exchanged notes with detention officers

serving as messengers. Officers would usually agree to pass the notes unless they were so busy that it was inconvenient for them to go to the recipient's cell. Jeffers and the other prisoner testified that although each had sent numerous notes, neither one had ever seen any officer open or read the note.

At that time the jail had no formal written policy dealing with notes between prisoners; however, published jail rules provided that incoming United States mail was regularly opened to check for contraband. Jeffers testified that he did not expect or intend that Officer Cleburn would read the note.

■ Jeffers contends that the officer's reading his note was an unreasonable search which infringed his reasonable expectation of privacy in the note, and therefore concludes that his fourth amendment rights were violated and the note should have been suppressed. Prisoners do retain some fourth amendment rights even though incarcerated. *United States v. Lilly,* 576 F.2d 1240 (5th Cir.1978); *Sostre v. Preiser,* 519 F.2d 763 (2d Cir.1975); *Bonner v. Coughlin,* 517 F.2d 1311 (7th Cir.1975). Jeffers argues that because the jail had no published rules prohibiting note passing and because previous notes had been delivered intact, he reasonably expected this note to remain private.

■ The application of the fourth amendment depends on whether the person invoking its protection can claim a justifiable, reasonable, legitimate expectation of privacy that has been invaded by the challenged governmental action. *Smith v. Maryland,* 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979); *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *United States v. Hinckley,* 672 F.2d 115 (D.C.Cir.1982).

■ Prison officials may inspect and examine the communications of inmates without depriving them of their constitutional rights. *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Denson v. United States,* 424 F.2d 329 (10th

Cir.1970), *cert. denied,* 400 U.S. 844, 91 S.Ct. 88, 27 L.Ed.2d 80 (1970). When an inmate voluntarily writes a letter and gives it to a guard for delivery to another inmate, he cannot reasonably expect the letter to remain private. *State v. Matthews,* 217 Kan. 654, 538 P.2d 637 (1975); *Thomas v. State,* 39 Md.App. 217, 384 A.2d 772 (1978), *aff'd,* 285 Md. 458, 404 A.2d 257 (1979); *State v. Johnson,* 476 S.W.2d 516 (Mo.1972), *cert. denied,* 409 U.S. 859, 93 S.Ct. 144, 34 L.Ed.2d 105 (1972); *Hicks v. State,* 480 S.W.2d 357 (Tenn.Cr.App.1972); *State v. Copeland,* 15 Wash.App. 374, 549 P.2d 26 (1976). Once prison officials have a right to examine such messages, no rule requires them to close their eyes to what they discover therein. *State v. McCoy,* 270 Or. 340, 527 P.2d 725 (1974).

Appellant contends that the cases which have allowed notes from prisoners to be used by the state involved instances in which the prisons had published regulations allowing prison officials to intercept and read inter-prisoner communications. We observe, however, that *Thomas v. State, supra,* is a case in which the prison had no published rules concerning the inspection of notes passed between prisoners. The defendant in *Thomas* sought on Fourth Amendment principles to suppress the use of the contents of a note which he, as a pretrial detainee, had sought to have delivered to a fellow prisoner. The note had been placed in a sealed envelope and handed to a detention officer for delivery, but the officer opened the envelope and read the contents.

■ The Court of Appeals of Maryland in its decision conceded that it could not say that the defendant knew or should have known that the envelope would be opened and its contents read. The Maryland court reasoned that merely because inmates may retain a degree of fourth amendment protection with respect to some matters, it does not necessarily follow that the defendant had a reasonable expectation of privacy in the contents of the envelope. However, even assuming that he had some justifiable expectation of privacy in the note so that

the fourth amendment was involved in the search, the court found that the search was reasonable under the circumstances and the fourth amendment was not violated. As the court observed:

> Although we believe that it would be preferable for jails ... to inform inmates, by regulation, posted notice or otherwise, concerning inspection of inmate to inmate correspondence, nevertheless, whatever privacy expectations the defendant Thomas may have had regarding the sealed envelope were outweighed by the legitimate security needs of the detention center. The absence of a regulation covering the matter does not, in our judgment, make the inspection and reading of correspondence from one inmate to another an unreasonable search under the Fourth Amendment.

*Thomas v. State,* 285 Md. 458, 469, 404 A.2d 257, 263 (1979).

We agree with the Maryland court's reasoning. Any jail by its very nature must be concerned with the security of its inmates and with the prevention of criminal activities within its confines.

■ Jeffers also argues that his first amendment rights were violated, citing *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); *Guajardo v. Estelle,* 580 F.2d 748 (5th Cir.1978); and *Navarette v. Enomoto,* 536 F.2d 277 (9th Cir.1976), for the proposition that prisoners retain their first amendment rights. The cited cases deal with the first amendment rights of parties *outside* the prisons to receive mail from within the prison.

> While First Amendment rights of correspondents with prisoners may protect against the censoring of inmate mail, when not necessary to protect legitimate governmental interests, see *Procunier v. Martinez,* [*supra*], this Court has not yet recognized First Amendment rights of prisoners in this context. [citations omitted] Furthermore, freedom from censorship is not equivalent to freedom from inspection or perusal.

*Wolff v. McDonnell,* 418 U.S. 539, 575–76, 94 S.Ct. 2963, 2984, 41 L.Ed.2d 935, 962 (1974).

We find no violation of appellant's rights in the state's use of the note attempted to be passed in the county jail.

## EVIDENCE OF ESCAPE

Prior to Jeffers' October, 1976 release from jail on an appeal bond, he was convicted in state court of receiving stolen property. A 12-year prison sentence was imposed. Jeffers was also convicted on four counts of federal firearm violations for which he received a 20-year prison sentence. In February, 1977, Jeffers was arrested and charged with the murder of Penny Cheney. While awaiting trial on the homicide charge Jeffers was kept in custody at the Pima County Jail. On September 27, 1977, Jeffers and his cellmate, Robert Butcher, escaped from jail and remained at large for approximately 24 hours before their recapture.

Prior to trial in the instant case, appellant's counsel filed a motion in limine to preclude any reference at trial by state's witnesses to appellant's escape from the Pima County Jail. The motion was denied and evidence of the escape was elicited from Jeffers on cross-examination over objection.

The law is clear that escape constitutes an exception to the general rule that evidence of a crime by the accused, entirely distinct from that for which he is on trial, is neither relevant nor admissible. *State v. White,* 101 Ariz. 164, 416 P.2d 597 (1966). The reason for this exception is that escape is a fact which may indicate a consciousness of guilt of the underlying offense and therefore, it is admissible. *State v. Wilcynski,* 111 Ariz. 533, 534 P.2d 738, *cert. denied,* 423 U.S. 873, 96 S.Ct. 141, 46 L.Ed.2d 104 (1975); *State v. White, supra.* Appellant argues that because it was possible that he escaped for reasons other than a consciousness of guilt of the murder charge, such as to avoid the combined 32-year prison sentences, the escape did not convey an unequivocal inference of consciousness of guilt. This ambiguity, he argues, renders the escape irrelevant to the murder charge.

We recognize that authority exists in other jurisdictions that "the circumstances must be such as to exclude every reasonable hypothesis except that of the defendant's guilt of the offense charged," in order for the fact of escape to be admissible at trial. *State v. Crawford,* 59 Utah 39, 201 P. 1030 (Utah 1921). *See United States v. Myers,* 550 F.2d 1036 (5th Cir.1977); *Damron v. State,* 58 Tex.Cr. 255, 125 S.W. 396 (1910). There is more recent authority which indicates that evidence of escape may be introduced in a criminal case, despite multiplicity of pending charges. *Johnson v. State,* 312 A.2d 630 (Del.Supr.1973); *State v. Guinan,* 506 S.W.2d 490 (Mo.App.1974); *State v. Hudson,* 491 S.W.2d 1 (Mo.App.1973); *Archie v. State,* 488 P.2d 622 (Cr.App.Okl., 1971); *Chapple v. State,* 528 S.W.2d 62 (Cr. App.Tex.1975); *State v. Piche,* 71 Wash.2d 583, 430 P.2d 522 (1967), *cert. denied,* 390 U.S. 912, 88 S.Ct. 838, 19 L.Ed.2d 882.

The admissibility of evidence of an escape is not determinative of the weight to be afforded to that fact, and the accused may go forward with the evidence to explain any alternative reasons he may have had for the escape. *State v. White,* 101 Ariz. 164, 416 P.2d 597 (1966). Jeffers did not attempt to explain why he waited until his incarceration on this offense to flee from the prison terms imposed rather than run when he was released from jail nearly a year before, but he was not denied the opportunity to present an explanation.

We hold that the existence of unserved sentences or unrelated criminal charges pending at the time of the escape did not render evidence of Jeffers' escape inadmissible. Rather, the existence of alternative reasons for the escape goes to the weight of the evidence and not to its admissibility. *State v. White, supra; accord, Archie v. State, supra; State v. Piche, supra.* There was no error in the trial court's admission of evidence of Jeffers' escape from the Pima County Jail.

## JAIL CLOTHING

On the first day that evidence was presented to the jury, Jeffers appeared in court wearing Pima County Jail clothing.

The clothing consisted of a short-sleeved blue shirt and dark blue pants. Jeffers wore civilian clothes throughout the rest of the lengthy trial.

Jeffers claims that the appearance in jail garb denied him the right to be presumed innocent, in contravention of the due process clause of the fourteenth amendment.

A state cannot compel an accused to stand trial before a jury in identifiable prison clothes. *Estelle v. Williams*, 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976). In order to run afoul of the proscription in *Estelle*, Jeffers' appearance in court in jail clothes must have been *compelled* by the state against his will. *See Bentley v. Crist*, 469 F.2d 854 (9th Cir.1972). Jeffers does not deny that he was given the opportunity to wear his street clothes in court and chose not to wear them. Rather, Jeffers claims that his choice to forego donning street clothing was involuntary because he was awakened several times during the previous night by jail personnel. We cannot agree that Jeffers was so tired or sick that he was unable to make the voluntary election to appear in court wearing jail clothes. From Jeffers' own testimony we calculate that he slept well over ten hours. During this time he endured six interruptions, most of which kept him awake only momentarily. These unfortunate interruptions fall short of coercion capable of overbearing Jeffers' will. We find no support in the record for the contention that Jeffers' choice to refuse street clothing was anything but an intentional relinquishment of a known right.

### EVIDENCE OF ASSAULT

Appellant Jeffers urges that the evidence of prior bad acts was introduced to prove his character as a "bad man" in violation of rule 404(b), Arizona Rules of Evidence. He urges that the prior assaults were not sufficiently similar to the assault on Doris or the murder of Penny to show any characteristic method, plan, or scheme, and he contends that the prejudicial effect far outweighed any possible relevance this evidence might have. He cites rule 403, Arizona Rules of Evidence, 17A A.R.S.

The evidence challenged by the defense was presented by Sharon Galarza, a prosecution witness. She testified that she had received a grant of immunity from pending criminal charges against her in return for her testimony against Jeffers. She testified that she had lived with Jeffers from late 1975 to May 1976 and had met Penny Cheney during that period. Sharon, Penny, and Jeffers were all using heroin then. Sharon was arrested for selling heroin in October, 1976, and apparently released soon afterwards. On November 6, 1976, she had a telephone conversation with Jeffers in which she told him that she had thought at first that Penny had been involved in her arrest, but later found she was mistaken. She testified that Jeffers then told her, "Well, nobody has to worry about her anymore. She's gone . . . . I killed her . . . . I just got tired of her \* \* \*." He said that he had proof that Penny had snitched on him. He invited Sharon to his room at the Thunderbird Motel for some heroin, adding that he was living with a woman whom he had forced to help him with the killing and that Sharon should not mention the killing to the woman because "she wouldn't appreciate if anyone knew." Sharon went to the motel, saw Jeffers, and met Doris. The next day Jeffers and the woman known as "Dirty Mary" went to Mexico to buy heroin. The woman stole Jeffers' money. Sharon telephoned Jeffers the following day, and he invited her to the motel for a share of the heroin. When she arrived, Jeffers and Doris were alone in the room. Jeffers locked the door, pulled the drapes, and assaulted Sharon, holding a large butcher knife to her throat and accusing her of ripping him off. He then forced Sharon to inject herself with a substance which she feared was poison, but was in fact heroin. At one point Sharon managed to catch Doris' eye and Doris smiled reassuringly, as if to indicate that the drug was not poisoned. On the day following this incident, Sharon saw Jeffers assault Roger Valery, accusing him of conspiring with Dirty Mary. Jeffers threw him onto a bed, held a gun between his eyes, and threatened to kill him.

Sharon also testified that during the first few days she lived with Jeffers, he told her of two prior assaults on Penny Cheney when he thought Penny had stolen some jewelry from him. Once Jeffers tried to overdose Penny, and once he chased her with an axe, chopped up a stereo, and chased her out a window.

On cross-examination, the defense attacked Sharon's character by eliciting testimony that she was a prostitute and a heroin addict and dealer. Sharon did not report what Jeffers had said and done to anyone until shortly before she was to go to trial on heroin and prostitution charges in mid-January 1977. She then told her attorney, who notified the county attorney's office. The defense questioned Sharon about why she had not come forward with this information earlier, implying that she had fabricated the story to avoid prosecution.

On redirect, Sharon testified that she did not inform the authorities immediately because "I just wanted to put it out of my head. I was scared. I didn't want to think about it." She finally told her attorney about Jeffers because she heard from a friend that "a white man with real fuzzy hair" had been looking for her, and "I thought it was Mr. Jeffers and it scared me." She related that Jeffers had beaten and choked her, held a gun to her head, and tried to overdose her while she lived with him, and that she feared reprisals if he caught up with her.

The list of "other purposes" in rule 404(b), for which other crime may be shown, is not exclusive; if evidence is relevant for any purpose other than that of showing the defendant's criminal propensities, it is admissible even though it refers to his prior bad acts. *State v. Tuell,* 112 Ariz. 340, 541 P.2d 1142 (1975); *State v. Thompson,* 110 Ariz. 165, 516 P.2d 42 (1973); *State v. Jones,* 26 Ariz.App. 68, 546 P.2d 45 (1976); *see also United States v. Barrett,* 539 F.2d 244 (1st Cir.1976). The trial judge must determine whether the probative value of the disputed evidence is outweighed by the danger of unfair prejudice; if so, the evidence should be excluded. *United States v.*

*Longoria,* 624 F.2d 66 (9th Cir.1980); *State v. Hays,* 17 Ariz.App. 202, 496 P.2d 628 (1972). The trial judge has considerable discretion in determining whether to admit evidence of other crimes and need not explain the basis for the decision to admit such evidence. So long as the decision is supported by the facts before the court, we will affirm the trial court's decision unless a clear abuse of discretion appears. *State v. Clark,* 126 Ariz. 428, 616 P.2d 888, *cert. denied,* 449 U.S. 1067, 101 S.Ct. 796, 66 L.Ed.2d 612 (1980); *State v. Aguirre,* 130 Ariz. 54, 633 P.2d 1047 (App.1981).

Evidence which tests, sustains, or impeaches the credibility or character of a witness is generally admissible. *State v. Mosley,* 119 Ariz. 393, 581 P.2d 238 (1978); *State v. Torres,* 27 Ariz.App. 556, 556 P.2d 1159 (1976). In *Torres,* the defendant threatened the witness, who then corroborated his false story. The court of appeals stated that:

> [A]ppellant's prior misconduct explained [the witness'] fear of him which caused her to tell a false story. Under these circumstances, where the prior misconduct had independent relevancy for some purpose other than showing a probability that appellant committed the crime for which he was being tried, it was properly admitted. Udall, Arizona Law of Evidence, Sec. 115.

*Id.* at 559, 556 P.2d at 1162. We believe that the evidence of Jeffers' assaults upon Sharon and others explained the fear Doris and Sharon felt for Jeffers and their reasons for failing to report the murder at once. The evidence helps counter the defense's insinuation that Sharon had fabricated the story to gain immunity.

The evidence was relevant for the purpose of bolstering these witnesses' credibility, and we find no abuse of discretion by the trial judge in admitting the evidence despite its prejudicial nature. The jury was given a proper limiting instruction stating that evidence of other crimes could not be considered to prove Jeffers' bad character or any disposition to commit crimes. We find no error in the admission of this evidence.

## PRIOR MURDER ATTEMPT UPON THE VICTIM

Appellant challenges the admission of evidence of what counsel have styled a prior murder attempt upon the victim, produced at trial in the form of the victim's hearsay statements. Edith Meck, manager of the apartments in which Jeffers lived, and Lillian Ramirez, a nurse at the Tucson Medical Center testified about contacts they had with the victim, Penny Cheney, approximately 11 months before her death. Mrs. Meck was permitted to describe to the jury an incident in which she observed Penny running from the direction of Jeffers' apartment, screaming for help. Mrs. Meck said Penny was cut on the hand and had left a trail of blood along the sidewalk where she ran. When Penny approached Mrs. Meck, she cried out that Jeffers had "doped her and threw her out the bedroom window." Mrs. Meck described Penny's condition as "very excited," and said her speech was difficult to understand. Penny's eyes "looked very funny" and she leaned on Mrs. Meck "as though she couldn't hardly stand up." Later that day Mrs. Meck observed Jeffers' bedroom window to be broken.

Soon after her encounter with Mrs. Meck, Penny was taken by ambulance to the Tucson Medical Center Emergency Room. There she met Nurse Lillian Ramirez who obtained and charted information to aid the doctor in Penny's diagnosis and treatment. Nurse Ramirez determined that Penny had sustained injuries to her right hand and left leg. The nurse testified that Penny was semi-stuporous and pale, that she had slow respiration, slurred speech, and pinpoint pupils that did not react to changes in light levels. Nurse Ramirez asked Penny what happened to her and Penny responded "that she had been drugged by her boyfriend, that friends were coming to help kill her and she had jumped [from a window] to get away." Penny refused to answer the nurse's question about what drug had been given her saying, "I don't know. I don't want him to get in trouble." Nurse Ramirez testified that Penny was eventually diagnosed and treated with narcan, which is used to counteract the effects of a narcotic on a patient.

Appellant makes three separate attacks upon the admission of the statements of Penny Cheney. First, Jeffers contends the incident constitutes a prior bad act which is inadmissible under rule 404(b), Arizona Rules of Evidence, 17A A.R.S. Jeffers also claims the statements are hearsay, not properly admissible under any exceptions listed in rule 803. Finally, Jeffers challenges the statements' admission as a denial of his sixth amendment right to confrontation.

### a. PRIOR BAD ACT

Rule 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

We have long held that where the existence of premeditation is in issue, evidence of previous quarrels or difficulties between the accused and the victim is admissible. *Sparks v. State,* 19 Ariz. 455, 171 P. 1182 (1918); *Leonard v. State,* 17 Ariz. 293, 151 P. 947 (1915). In *Leonard* we upheld the admission of evidence of trouble between the defendant and the victim four years before the homicide there at issue. *Id.*

The admissibility of such testimony is not measured by remoteness in time. Rather, the length of time is a factor to be considered by the jury in determining the weight of the evidence. *State v. Moore,* 111 Ariz. 355, 529 P.2d 1172 (1974).

Evidence of prior trouble between the victim and the accused derives its relevance from the fact that the existence of prior ill will toward the victim not only renders the commission of the crime more probable, but tends to show the malice, motive or premeditation of the accused. *Leonard v. State, supra; State v. Denny,* 27 Ariz.App. 354, 555 P.2d 111 (1976).

Evidence of this prior bad act, taken together with the expression in Jeffers' intercepted jail note of his desire to kill Penny by heroin overdose, shows a continuing state of mind from which the jury could properly infer that Jeffers carried out his desire. *See State v. Moore, supra.*

Furthermore, Jeffers professed a deep abiding love for Penny which would not allow him to cause her any harm. The opening statement for the defense made several references to this love Jeffers had for Penny. Thus, evidence of this prior incident would also be admissible to rebut Jeffers' claim of inability to harm his loved one. *See also, State v. Denny, supra* (evidence of defendant's prior assault on homicide victim admissible to rebut claim of victim's personal abuse of defendant).

In addition to relevance, admission of prior bad act evidence requires sufficient indicia of its reliability. *State v. Gause,* 107 Ariz. 491, 489 P.2d 830 (1971), *vacated on other grounds,* 409 U.S. 815, 93 S.Ct. 192, 34 L.Ed.2d 71 (1972). In *Gause* we stated that "[a] bald expression of fear by a murder victim standing alone does not have sufficient reliability to be admitted." *Id.* at 495, 489 P.2d at 834. Penny's statements need not stand alone in reflecting their reliability to render Penny's statements admissible. The substance of the statements is that Penny went through a window somehow because Jeffers drugged her and threatened her. Her statement was corroborated by her fresh cuts, and the trail of blood and broken window. That she had been drugged was corroborated by her demeanor, appearance, and treatment with narcan. The fact that the doctor's diagnosis and Penny's refusal to reveal what drug was used because she did not "want to get [Jeffers] in trouble," lends further reliability, because her protective attitude toward Jeffers suggests that she did not fabricate his involvement with her injury.

Jeffers argues that the discrepancy between the statements as related by the two witnesses regarding whether Penny jumped or was thrown through the window strips the statements of their reliability and renders them inadmissible. We do not agree. This discrepancy is minor and has little impact on what makes the incident relevant to Penny's murder. We hold that the statements are sufficiently reliable and relevant to be properly admissible for the purposes previously stated.

### b. HEARSAY

The trial court admitted Penny's statement to Mrs. Meck under the excited utterance exception to the hearsay rule. Rule 803(2) of the Rules of Evidence defines excited utterance as "A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Three requirements must be met for the proper admission of an excited utterance under this exception to the hearsay rule: (1) there must have been a startling event; (2) the statement must relate to the startling event; and (3) the statement must be made spontaneously, that is, soon enough after the event so as not to give the declarant time to fabricate. *State v. Barnes,* 124 Ariz. 586, 606 P.2d 802 (1980); *State v. Woolery,* 93 Ariz. 76, 378 P.2d 751 (1963).

Jeffers argues that the statement fails to satisfy two of the above requirements and was, therefore, improperly admitted. In that regard, Jeffers claims that the statement related to the unreliable perceptions of a declarant under the influence of an intoxicating drug rather than the startling event itself; and secondly, that the statement lacked the requisite spontaneity.

The law is clear that this court will not reverse the trial court's ruling under the excited utterance exception to the hearsay rule absent a clear abuse of discretion. *State v. Dale,* 113 Ariz. 212, 550 P.2d 83 (1976); *State v. Kevil,* 111 Ariz. 240, 527 P.2d 285 (1974); *State v. Hughes,* 120 Ariz. 120, 584 P.2d 584 (App.1978).

The basis for the exception is that the event produces nervous excitement making fabrication unlikely. *State v. Peeler,* 126 Ariz. 254, 614 P.2d 335 (App.1980). Our courts have not attempted to confine

the application of the excited utterance exception solely to indisputably reliable statements. In *Peeler, supra,* the exception was applicable even though evidence was presented that statements made by the victim would probably be less reliable during periods of extreme agitation. Similarly, in *State v. Yee,* 121 Ariz. 398, 590 P.2d 937 (App.1979), the declarant's statements were admitted even though his wife testified that her husband was particularly unreliable when he became excited and that she distrusted the statements in question. Admission as a hearsay exception is not foreclosed by the fact that a statement's reliability has been impugned. *Id.*

The record leaves no room for doubt that Penny was under the influence of a narcotic drug at the time she made the statement, "He drugged me." Jeffers contends that the fact of intoxication plus the inconsistency between Penny's two statements establish that the statements resulted from the drug's effect rather than the excitement of the startling event. Mrs. Meck testified that despite Penny's difficulty with her coordination, she appeared to be very excited, and although she was hard to understand, Penny seemed to know what she was talking about.

 Jeffers would have us declare Penny's statements to be so inherently unreliable that exclusion is the only cure. This we decline to do. It is unquestionable that the use of drugs may have a deleterious effect on one's ability to perceive and communicate. *See State v. Ballesteros,* 100 Ariz. 262, 413 P.2d 739 (1966). Nevertheless, a witness is not rendered incompetent to testify merely because he was under the influence of drugs at the time of the incident about which he is testifying or at the time he testifies. *Ballesteros, supra; Wilson v. United States,* 232 U.S. 563, 34 S.Ct. 347, 58 L.Ed. 728 (1913) (witness on morphine at time testified). *See, State v. Reyes,* 99 Ariz. 257, 408 P.2d 400 (1965) (by implication); *State v. Arriola,* 99 Ariz. 332, 409 P.2d 37 (1965) (by implication). The question of reliability here, just like the question of competency, is within the sound

discretion of the trial court. In both instances the question of credibility remains for submission to the jury.

 We find Jeffers' argument that the statement was not made soon enough after the startling event to possess the requisite spontaneity to be without merit. Penny ran approximately two blocks from Jeffers' apartment to Mrs. Meck's office, where she made the statement in response to Mrs. Meck's question, "What happened?" Penny was still bleeding from a fresh cut that she presumably incurred during the startling event of being drugged and going through a window. Penny remained in Mrs. Meck's office only ten to fifteen minutes before an ambulance arrived. The totality of the circumstances indicate that Penny was under the stress and excitement caused by the startling event when she made the statement. *See generally State v. Barnes, supra; State v. Morrow,* 108 Ariz. 108, 493 P.2d 119 (1972); *State v. Perry,* 116 Ariz. 40, 567 P.2d 786 (App.1977). The trial court did not err in admitting it.

The trial court admitted Penny's statement to Nurse Ramirez under the medical diagnosis exception to the hearsay rule. Jeffers maintains that this was error.

Rule 803 excepts from the hearsay rule statements made for purposes of medical diagnosis or treatment. Subsection 4 of the rule defines such statements. It provides:

> Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

Arizona's adoption of this rule verbatim from the federal rule significantly broadened the scope of admissible patient to physician hearsay statements. Udall and Livermore, Arizona Practice: Law of Evidence, § 129 (2d ed. 1982) (hereinafter, Udall).

Two important factors derive from the rule's rationale: (1) whether the declarant's motive is consistent with receiving medical

care; and (2) whether it is reasonable for the physician to rely on the information in diagnosis or treatment. *United States v. Iron Shell,* 633 F.2d 77 (8th Cir.1980). Thus in *Iron Shell,* the court admitted an assault victim's statements to her doctor stating: "It is important to note that the statements concern what happened rather than who assaulted her. The former in most cases is pertinent to diagnosis and treatment while the latter would seldom, if ever, be sufficiently related." *Id.* at 84. *Accord, United States v. Nick,* 604 F.2d 1199 (9th Cir.1979). The Advisory Committee's Note to rule 803(4) also makes a point of illustrating that statements as to fault would not ordinarily qualify under the exception.

In the instant case Nurse Ramirez testified that who administered the narcotic was not reasonably pertinent to diagnosis or treatment. Furthermore, Penny's motive to provide information for treatment must be regarded with suspicion because of her refusal to name the drug used on her. Penny's statement fails to satisfy either prong of the test and should not have been admitted into evidence under the medical diagnosis exception to the hearsay rule.

The state urges other grounds for the statement's admission; excited utterance, expression of present state of mind, or expression of fear by a murder victim. We find none of these to except Penny's statement to Nurse Ramirez from the hearsay rule. First, Penny's reflective capabilities, as illustrated by her refusal to disclose what drug was used, remove the statement from the excited utterance category because the declarant's ability to fabricate is apparent. Secondly, we perceive no significant difference between an expression of fear by a murder victim and an expression of state of mind under rule 803(3). Both exceptions require that the statement show some state of mind which is relevant to the issues involved in the criminal proceeding. *See State v. Ramirez,* 116 Ariz. 259, 569 P.2d 201 (1977); *State v. Gause,* 107 Ariz. 491, 489 P.2d 830 (1971), *vacated on other grounds,* 409 U.S. 815, 93 S.Ct. 192, 34 L.Ed.2d 71 (1972). Penny's state of mind at that remote date would be of questionable relevance to any issues at trial. Thus, admission under the state of mind exception would not have been proper.

Although we find error in the admission of the second statement, we conclude that such error was harmless. The statement indicated that Penny was drugged by Jeffers, its content was the same as that of the properly admitted statement to Mrs. Meck. This repetition, although error, was not prejudicial. *State v. Woolery,* 93 Ariz. 76, 378 P.2d 751 (1963). The second part of the statement to Nurse Ramirez to the effect that Penny jumped from the window to get away from friends that were coming to kill her, does not incriminate Jeffers and is not prejudicial. If anything, the contradiction between this statement and the first had the potential to benefit Jeffers' case.

## c. RIGHT TO CONFRONTATION

Appellant asserts that introduction into evidence of Penny's hearsay statements denied him the right to confrontation guaranteed by the sixth amendment and made applicable to the states through the fourteenth amendment. *Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). A literal reading of the confrontation clause would require the exclusion of any statement, however relevant, made by a declarant who was, for any reason, absent from trial. Such a reading has long been rejected as unintended and too extreme. *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980).

The primary concern of the confrontation clause is to assure that the jury has an adequate basis upon which to evaluate the truth of the statement. *Dutton v. Evans,* 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970). Cross-examination, although preferred, is not the sole method by which the confrontation clause may be satisfied. Absent cross-examination, the essential issue is whether under all of the circumstances, the hearsay statement has a high degree of reliability. *United States v. Nick,* 604 F.2d 1199 (9th Cir.1979).

In sum, when a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate "indicia of reliability." *Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception.* In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness. (emphasis added) *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597, 607 (1980).

■ There is little doubt that the excited utterance qualifies as a firmly rooted hearsay exception, *see* 6 Wigmore, Evidence § 1746 (Chadbourn rev. 1976), and generally any evidence that falls within such an exception would for that reason alone satisfy the reliability requirement. In addition, much of what Penny stated was corroborated by independent evidence. The appellant's right to confrontation was not violated.

## NEGATIVE EVIDENCE

Central to Jeffers' defense was his testimony that he was not present when Penny Cheney died, but was at or en route from Danny's Hideaway Bar in South Tucson at the time. In that regard Jeffers testified as follows. Penny Cheney arrived at the motel room in which Jeffers and Doris Van Der Veer had been living at approximately 11:00 A.M. on the day she died. At Jeffers' request Doris left immediately and did not return until between 1:00 and 2:00 that afternoon. The three of them remained in the motel room for 30 to 45 minutes when Jeffers left to attempt to purchase some heroin. Jeffers went to Danny's Hideaway, which is about a 30-minute drive from the motel. After spending a few hours in the bar, Jeffers met a man who agreed to help him in the purchase of heroin. He accompanied this man out of Danny's Hideaway at 5:30 or 6:00 that evening. Upon his return to the motel room at 7:00 P.M., Jeffers discovered Penny Cheney, already

dead, lying on the bed and Doris Van Der Veer sitting quietly in a chair nearby. In sum, Jeffers' testimony places his arrival at Danny's Hideaway no earlier than 2:00 and as late as 3:15 on October 21, 1976.

In order to rebut Jeffers' testimony, the state called Sharon Galarza to the stand to testify that she was in Danny's Hideaway on October 21, 1976 from about 12:30 P.M. to sometime between 2:30 P.M. and 3:00 P.M. Galarza testified that she knew Jeffers at the time, but she did not see him at Danny's that day. She testified that she remembered that day because it was the day she was arrested on a sale of narcotics charge.

Jeffers challenges the trial court's admission over objection of Galarza's rebuttal testimony in that it constituted negative evidence which lacked sufficient foundation to give it probative value.

■ The acceptance or rejection of negative evidence is largely a matter of discretion for the trial court. *State v. Kelly,* 111 Ariz. 181, 526 P.2d 720 (1974). The general rule is that negative evidence to the effect that the witness did not see an event occur can rise to the level of probative value only when supported by a sufficient foundation that the witness' position and attitude were such that he probably would have seen the event had it happened. *Byars v. Arizona Public Service Co.,* 24 Ariz.App. 420, 539 P.2d 534 (1975).

■ Galarza's testimony concerning her observations of October 21, 1976, if believed, establishes that Jeffers was not at Danny's Hideaway between 12:30 and 2:30 or 3:00 P.M. The testimony indicates that Jeffers was not at the establishment before approximately 3:00 P.M., and it was admissible for that purpose. The appellant could have been at the bar at a later hour, and this is what the defense argued. We find no error in the admission of the evidence.

## EXCLUSION OF CONVERSATION

The defense called as a witness Myron McRoberts, a painter who had stayed at the Linda Vista Motel the week of the murder.

He testified that on the afternoon of the murder, he saw Doris and a blonde woman leave the motel together in a dark-colored car. He said he remembered the day because it was raining so that he couldn't work, because he and his partner folded their dropcloths behind the motel contrary to their usual practice, because he had gone out drinking the night before and was somewhat hungover, and because he remembered a conversation he had had with Mrs. Wheeler, the manager of the motel. The state objected to the introduction of the content of the conversation on hearsay grounds, and the objection was sustained. The defense offered to prove that Mrs. Wheeler had told McRoberts, "There's a cute blonde in room 7," and that was one reason he identified the particular date.

■ Appellant contends that the statement was admissible nonhearsay in that the statement was offered not for the truth of the matter asserted, but to show how McRoberts' remembered the day in question. Since the evidence was offered only to prove that the statement had been made, it was not hearsay. *State v. Johnson,* 106 Ariz. 539, 479 P.2d 424 (1971). The trial court should have allowed the offered testimony.

■ The error by the trial court is not reversible because the excluded evidence was cumulative. The witness had already described several reasons why he remembered the day, and the excluded testimony merely added an additional reason for remembering the day.

## EXCLUSION OF PRIOR CONSISTENT STATEMENTS

Jeffers contends that certain statements of defense witnesses were improperly excluded as hearsay. Three statements are involved; the first was allegedly made by Jeffers to his mother in a telephone call on November 7, 1976, shortly after the murder, to the effect that Penny was dead and that she had overdosed. The defense attempted to introduce this statement through the testimony of Jeffers and of his mother, but hearsay objections were sustained as to

both. The second and third statements were allegedly made to William Heuisler, a private investigator, by Myron McRoberts and Dave Birket, respectively, when he first spoke with them about their recollection of the events at the motel. In answer to Heuisler's question whether he remembered anyone from around the motel, McRoberts reportedly stated that he saw a "good-looking blonde" and Birket said he remembered seeing another girl there with tattoos. The defense attempted to introduce these statements through Heuisler's testimony, but the court sustained hearsay objections.

Jeffers argues that the statements were not hearsay because they were prior statements consistent with the declarants' testimony at trial and were offered to rebut express or implied charges of recent fabrication. Rule 801(d)(1)(B), Rules of Evidence, 17A A.R.S., *Ray Korte Chevrolet v. Simmons,* 117 Ariz. 202, 571 P.2d 699 (App. 1977).

■ The state points out that the declarants were never impeached upon the particular matters asserted in the prior statements. Thus, because the prior statements did not rebut the alleged fabrications or memory lapses, those statements were not admissible under rule 801(d)(1)(B). *See: People v. Mullin,* 197 Cal.App.2d 479, 17 Cal.Rptr. 516 (1961); *State v. Fleming,* 354 Mo. 31, 188 S.W.2d 12 (1945). Jeffers' statement that Penny was dead and had overdosed did not rebut the alleged fabrication that Jeffers had not been involved in her death. McRoberts' testimony was not attacked on the question of whether he had ever seen a good-looking blonde around the motel, nor was Birket's testimony attacked on whether he had ever seen a tattooed woman; rather, the challenges were to their recall of the date and circumstances when they saw the women and the accuracy of their identifications.

■ With respect to Jeffers' alleged statement, the state urges that because the murder had already occurred when he made the statement, his motive to fabricate had already arisen. Therefore, the statement is

inadmissible. *United States v. Greene,* 497 F.2d 1068 (7th Cir.1974), *cert. denied,* 420 U.S. 909, 95 S.Ct. 829, 42 L.Ed.2d 839 (1975); *People v. White,* 57 App.Div. 699, 393 N.Y.S.2d 615 (1977). The state also contends that the trial judge was within his discretion to exclude the statement as self-serving, because such statements lack trustworthiness. *State v. Duffy,* 124 Ariz. 267, 603 P.2d 538 (App.1979).

As to Jeffers' statement, we hold that the trial judge properly excluded it. As for McRoberts' and Birket's statements, we agree that the statements were not in rebuttal of any prior challenged testimony and were properly excluded as hearsay.

## IMMUNITY FOR DEFENSE WITNESS

Defense counsel moved at trial for a grant of immunity to a defense witness, Mr. Louie Rosso. The motion was denied. The defense called Rosso to testify at trial, but Rosso claimed his fifth amendment privilege against self-incrimination and refused to answer any questions pertaining to Jeffers or Doris. In their motion for new trial and in the briefs, defense counsel alleged that if Rosso had been granted immunity, he would have contradicted Doris' testimony that shortly before the murder she and Jeffers had purchased such a large quantity of heroin from Rosso that Jeffers would not have had to replenish his supply on the day of the murder. Thus, Jeffers argues that Rosso would have corroborated Jeffers' alibi testimony that on the afternoon Penny Cheney died, Jeffers had left the motel to attempt to buy heroin at Danny's Bar. He also urges that Rosso would have attacked Doris' credibility as a witness in other particulars.

Appellant concedes that this court has repeatedly held that due process does not require that immunity be granted to defense witnesses at the defense's request and that it is a matter for prosecutorial discretion to decide when the public interest would be best served by a grant of immunity. *State v. Verdugo,* 124 Ariz. 91, 602 P.2d 472 (1979); *State v. Swinburne,* 116 Ariz. 403, 569 P.2d 833 (1977); *State v. Buchan-*

*an,* 110 Ariz. 285, 518 P.2d 108 (1974). Nevertheless, he urges that these cases are not controlling because they did not deal with claimed sixth amendment violations.

Appellant contends that the court's failure to grant Rosso immunity denied him his sixth amendment right to compel the testimony of witnesses on his behalf and his rights to due process and a fair trial. He cites and relies heavily upon *Government of the Virgin Islands v. Smith,* 615 F.2d 964 (3rd Cir.1980) and *State v. Broady,* 41 Ohio App.2d 17, 321 N.E.2d 890 (1974). At the outset, we find that *Broady* is inapplicable to the case at bar, because the Ohio statute did not require that immunity could be granted only on the application of the prosecutor.

■ We decline to follow the Third Circuit's lead in the *Virgin Islands* case. A.R.S. § 13–1804, now § 13–4064, explicitly provides that immunity is to be granted at the prosecuting attorney's request and does not authorize the court to grant immunity on its own motion. Additionally, we note that the *Virgin Islands* case is distinctly in the minority. *See, e.g., United States v. Herbst,* 641 F.2d 1161 (5th Cir.1981), and cases cited therein at 1168; *United States v. Turkish,* 623 F.2d 769 (2d Cir.1980), and cases cited therein at 772–74. Even the Third Circuit's opinion is divided on this question. *Cf. United States v. Rocco,* 587 F.2d 144 (3d Cir.1978). As for Jeffers' sixth amendment claims, we agree with the Second Circuit's reasoning in *Turkish, supra* at 774:

[T]he Sixth Amendment's Compulsory Process Clause gives the defendant the right to bring his witness to court and have the witness's non-privileged testimony heard, but does nor [*sic*] carry with it the additional right to displace a proper claim of privilege, including the privilege against self-incrimination. [citations omitted] While the prosecutor may not prevent or discourage a defense witness from testifying, [citations omitted], it is difficult to see how the Sixth Amendment of its own force places upon either the prosecutor or the court any affirma-

tive obligation to secure testimony from a defense witness by replacing the protection of the self-incrimination privilege with a grant of use immunity.

Rosso's evidence would not have provided Jeffers with an effective alibi; at best, it would have helped corroborate his explanation for his alibi. It hardly rises to the level of the evidence in the ·*Virgin Islands* case, in which the witness inculpated himself. We find that Jeffers' contentions on this issue are without merit.

The appellant also claims error by the trial court in failing to give defendant's requested instruction that the defense unlike the prosecution was powerless to grant any witness immunity in order to assure their testimony.

Appellant has failed to cite any authority which would require the court to give such an instruction. The jury was aware during trial and from closing arguments that the prosecution alone presented the testimony of immunized witnesses. The defense stated in closing argument that they had been unable to present the testimony of the alleged alibi witness who Jeffers stated he saw at Danny's Bar at the time of the murder:

> No one in the world wishes more than I, except maybe Mr. Jeffers, that we could have had that person in here that sold him that heroin in Danny's on October 21st. I would have given anything. I would have stopped practicing law to have that man in here and I like to practice law, but we didn't and we couldn't, but we tried.
>
> How likely do you think it is that someone out at Danny's, in the business of selling heroin, is going to talk to the defense and come in here in front of a jury and tell you, "I did it." And subject himself to criminal prosecution. Unlikely and improbable. TR 19–125.

The defense repeatedly attacked the immunized witnesses, arguing that they fabricated their testimony to escape criminal prosecution. We find that the defense was allowed to make its point repeatedly and that this argument, the questions asked at trial,

and the standard credibility instruction combined to give Jeffers a fair opportunity to present his theory of the case. We find no error in the failure of the trial court to give appellant's instruction on immunity.

## INSTRUCTION DEFINING POISON

Appellant contends that the trial court erred in instructing the jury that "Murder by means of poison is . . . first-degree murder" and that "The word 'poison' means any substance introduced into the body by any means which by its chemical action is capable of causing death." (Jury Instructions Nos. 9, 11). He argues that heroin is not a "poison" under the definition in *United American Life Ins. Co. v. Beadel,* 13 Ariz. App. 196, 199, 475 P.2d 288, 291 (1970), namely, "any substance having an *inherent* deleterious property which renders it, when taken into the system, as capable of destroying life." [emphasis in original]. Thus, he concludes, the instructions were not justified by the evidence presented and hence were prejudicial error. *State v. Williams,* 120 Ariz. 600, 587 P.2d 1177 (1978); *State v. Heath,* 122 Ariz. 36, 592 P.2d 1302 (1979).

We find no merit in this argument. The *Beadel* case, *supra,* dealt with civil matters involving insurance coverage and is not controlling on this issue. In *Beadel* the court recognized the conflict in authority as to whether the term "poison" is limited to substances which are "inherently" toxic, or whether it includes all ingested substances which are "toxic in fact." In this civil case, the court of appeals, acting from common principles of contractual construction and insurance law, resolved this ambiguity by explicitly invoking "the rule to construe undefined terms against the insurer" that drafted the policy. *Id.* at 200, 475 P.2d at 292. In this criminal case, we are not constrained by such presumptive rules of construction, and are free to make a more neutral examination of this issue. We find the jury instruction given in the court below reflects the better definition of poison in criminal cases. More specifically, there is substantial authority that heroin is

considered a poison in the criminal context. *Tidd v. Skinner,* 225 N.Y. 422, 122 N.E. 247, 3 A.L.R. 1145 (1919); *Napier v. State,* 357 So.2d 1001 (Ala.App.1977), *rev'd on other grounds,* 357 So.2d 1011 (Ala.1978); *People v. Brown,* 37 Mich.App. 192, 194 N.W.2d 560 (1971); *People v. Cruciani,* 70 Misc.2d 528, 334 N.Y.S.2d 515 (1972). The evidence was in conflict whether the victim died of a heroin overdose or by strangulation. The defense theory was that Penny died of an overdose either self-administered or administered by persons other than the defendant. The prosecution's theory was that Jeffers administered the heroin. Thus the evidence presented justified the instructions and there was no error.

## NEWLY DISCOVERED EVIDENCE

Following his conviction, Jeffers came into contact with Stanford A. Lewis, a fellow inmate at the Pima County Jail. Lewis agreed to testify that he saw Jeffers in Danny's Bar sometime in October, 1976. Jeffers filed a motion to vacate judgment on the basis of this newly discovered evidence. At the evidentiary hearing Lewis was unable to narrow down the date on which he had seen Jeffers beyond that it was during the last two weeks of October. Other testimony indicated that Lewis had first told investigators that it was definitely before October 17 and as early as October 10, 1976, when he saw Jeffers in the bar. Jeffers claims Lewis might have seen him in Danny's Bar on the day of the murder, October 21, 1976. The trial court denied the motion to vacate. Jeffers claims this was error.

Jeffers also filed a petition for post-conviction relief on the ground of newly discovered evidence. That evidence included a statement by Charles Van Der Veer, Doris' husband, that he had heard Doris say she choked Penny Cheney and injected her with heroin. Charles was also present with Doris and Sharon Galarza at a meeting that had not been mentioned at trial. The "new" evidence also included a statement that Ramona Epling was aware of information that she did not testify about and that

part of her testimony was false. The court denied the petition without granting an evidentiary hearing on the matter. Jeffers claims this was error and that dismissing the petition without hearing denied him the right to a hearing on his claim.

In order for relief to be granted because of newly discovered evidence, the material introduced would have to satisfy five requirements: (1) it must truly be newly discovered, i.e., discovered after the trial; (2) the record must contain facts from which the court can infer due diligence; (3) the evidence must not be merely cumulative or impeaching; (4) it must be material to the issues involved; and (5) it must be evidence that would *probably* change the verdict if a new trial was ordered. *State v. Austin,* 124 Ariz. 231, 603 P.2d 502 (1979), *cert. denied,* 446 U.S. 911, 100 S.Ct. 1841, 64 L.Ed.2d 264 (1980); *State v. Urry,* 104 Ariz. 244, 450 P.2d 1018 (1969); Rules 24.2 a(2), 32.1, Arizona Rules of Criminal Procedure, 17 A.R.S. A trial court in granting or denying a motion for new trial is accorded broad discretion. The trial court's ruling will not be reversed unless an abuse of discretion affirmatively appears. *State v. Salinas,* 129 Ariz. 364, 631 P.2d 519 (1981); *State v. Jones,* 125 Ariz. 417, 610 P.2d 51 (1980). Further, the witness who is expected to testify must appear to the trial court to be credible. Lewis' credibility is for the judge hearing the motion to determine. *State v. Salinas, supra.*

The trial court found that the testimony of Stanford Lewis did not warrant a new trial. More is required to warrant a new trial than mere conjecture or a possibility that the proffered testimony would affect the verdict. *State v. Austin, supra.* We do not believe that Lewis' inconclusive testimony satisfied the requirement that the new evidence would probably have changed the verdict. Furthermore, the motion was properly denied if Lewis' testimony was not credible to the trial court. *State v. Hughes,* 13 Ariz.App. 391, 477 P.2d 265 (1970). We find no abuse of discretion in the denial of Jeffers' motion for new trial based on the testimony of Stanford Lewis.

The trial court also did not err in denying Jeffers' petition for post-conviction relief. It has long been settled that where a defendant knows of the existence and identity of a witness before trial and makes no effort to obtain the witness' testimony, such testimony will not ordinarily justify a new trial. *State v. Salinas, supra; State v. Yanich,* 110 Ariz. 172, 516 P.2d 308 (1973). The existence and identity of Charles Van Der Veer and his relationship to Doris were well known by the defense in this case long before trial. The statement of Charles concerned statements made by Doris which had been covered at trial. There is also considerable doubt of Charles' reliability as a witness when he waited such a long time to make his statement. The record supports the ruling of the trial judge.

Ramona Epling was a witness at trial and was subjected to vigorous cross-examination. The jury was presented with matters which may have caused them to question her testimony. Evidence concerning information she possessed, but about which she was never asked, is hardly newly discovered. *See State v. Ford,* 108 Ariz. 404, 499 P.2d 699 (1972), *cert, denied,* 409 U.S. 1128, 93 S.Ct. 950, 35 L.Ed.2d 261 (1973).

Jeffers argues that he was denied the right to subpoena witnesses because the trial court refused to grant an evidentiary hearing. In order to be entitled to a hearing the proponent must present the court with a colorable claim. To be a colorable claim, the offering must appear to be valid; that is, "if the defendant's allegations are taken as true, would they change the verdict?" *State v. Richmond,* 114 Ariz. 186, 194, 560 P.2d 41, 49 (1976).

Here, the trial court found that even if Jeffers' "new" evidence was taken as true, a new trial would not be justified. We agree with the trial court that the evidence is merely impeaching and that it was far from probable that the evidence would cause a different result. We further hold that it was not newly discovered.

## RESENTENCING BY TRIAL JUDGE

On April 14, 1978, the Honorable Ben C. Birdsall sentenced appellant to death for the crime of first degree murder. While the appeal of the conviction and sentence were pending before this Court, the entire matter was remanded for sentencing in accordance with *State v. Watson,* 120 Ariz. 441, 586 P.2d 1253 (1978), *cert. denied,* 440 U.S. 924, 99 S.Ct. 1254, 59 L.Ed.2d 478 (1979).

Appellant was again sentenced to death. He raises several additional issues on appeal of his resentencing.

Appellant contends that the resentencing by Judge Birdsall, the trial judge, denied him his constitutional right to a fair and impartial tribunal. Prior to the resentencing, a hearing was conducted by Judge Robert O. Roylston to determine whether the trial judge should conduct the resentencing. Evidence adduced at the hearing showed the trial judge had been the target of a scheme involving the receipt of unsolicited goods from several mail order firms. The judge reported these activities to the postal authorities in order to get the mailings stopped. Appellant admitted sending these mailings to the judge, however, he was never charged with any crime in connection with these mailings. Additional evidence indicated that Judge Birdsall was annoyed at the matter and wanted it stopped, but that he treated it "pretty much as a joke." Judge Roylston found there were not sufficient grounds for finding bias or prejudice; appellant's motion for change of judge was denied.

We do not find a violation of appellant's right to a fair and impartial tribunal at every stage of the proceeding. He received a fair hearing on the matter. The burden of proof was on appellant as he was the party alleging the bias or prejudice. *State ex rel. Riley v. Collins.* 7 Ariz.App. 36, 435 P.2d 871 (1968). He failed to meet this burden.

Additionally, we agree with the court of appeals when they stated:

[W]here a party acts deliberately and with an ulterior motive in such a way as to cause the judge to become biased and prejudiced against that party, he is not entitled to have the judge disqualified. *Ponder v. Davis,* 233 N.C. 699, 65 S.E.2d 356 (1951); *In Re Union Leader Corporation,* 292 F.2d 381 (1st Cir.), *cert den'd.* 368 U.S. 927, 82 S.Ct. 361, 7 L.Ed.2d 190 (1961).

*Smith v. Smith,* 115 Ariz. 299, 303, 564 P.2d 1266, 1270 (App.1977).

■■■■ This kind of conduct should not be rewarded. Furthermore, appellant has not shown how this alleged bias or prejudice operated to his detriment. This court will search the record and make an independent determination whether the death penalty should be imposed. *State v. Richmond,* 114 Ariz. 186, 560 P.2d 41 (1976), *cert. denied,* 433 U.S. 915, 97 S.Ct. 2988, 53 L.Ed.2d 1101 (1977). This we have done and have found no error in the sentence imposed by the trial judge. Appellant has not received a harsher sentence than that received in the original sentencing.

## AGGRAVATING CIRCUMSTANCES

■■■■ The state bears the burden of proving the existence of aggravating circumstances beyond a reasonable doubt. A.R.S. § 13–703(C); *State v. Jordan,* 126 Ariz. 283, 614 P.2d 825 (1980). In death penalty cases this court independently reviews the facts that the trial court found established the presence or absence of aggravating and mitigating circumstances, and we determine for ourselves if the latter outweigh the former when we find both to be present. *State v. Blazak,* 114 Ariz. 199, 560 P.2d 54 (1977); *State v. Richmond,* 114 Ariz. 186, 560 P.2d 41 (1976).

The trial court found that the evidence established two of the statutory aggravating circumstances: A.R.S. § 13–703(F)(3) and (6).

■■■ A.R.S. § 13–703(F)(3) provides that the sentencing court must consider it an aggravating circumstance if "[i]n the commission of the offense the defendant knowingly created a grave risk of death to another person or persons in addition to the victim of the offense." Appellant contends that this subsection refers to indiscriminate attacks in which the murderous act itself puts others in a danger zone, such as bombing an inhabited building or firing a gun into a crowd. He points out that in all Arizona cases to date which have affirmed the existence of this aggravating circumstance, the murderous attack has itself injured another person or persons in addition to the victim of the offense. *See State v. Doss,* 116 Ariz. 156, 568 P.2d 1054 (1977) (gunshots in crowded college gymnasium killed victim and wounded a bystander); *State v. Blazak,* 114 Ariz. 199, 560 P.2d 54 (1977) (gunshots in crowded bar killed two victims and wounded another); *cf. State v. Clark,* 126 Ariz. 428, 616 P.2d 888 (1980) (this aggravating circumstance not found in quadruple murder case because evidence indicated that allegedly endangered victim was in another room, thus outside the "zone of danger" created by murderer's gunshots).

The person found to be the object of the grave risk of death was Doris Van Der Veer. Doris testified that appellant pointed a gun at her when she returned to the motel room and found Penny Cheney lying on the bed unconscious. Based upon this evidence, the jury found appellant guilty of assault with a deadly weapon. The trial judge also used this evidence to support the finding that appellant created a grave risk of death to Doris, stating, "The Court has no reasonable doubt that the defendant would have killed Doris Van Der Veer with that gun if she had not complied with his orders."

Despite the finding of the trial judge we do not believe that the evidence brings this situation within the orbit of what was intended by A.R.S. § 13–703(F)(3). The pointing of a gun at Doris was sufficient to support a conviction for assault with a deadly weapon, but the act is not sufficient to satisfy the requirements of this particular aggravating circumstance.

The peculiar facts of this case show, according to Doris' testimony, that the de-

fendant put the gun down after the initial confrontation with her, and he proceeded with his program of killing the victim. Doris was required to remain quiet and submissive to Jeffers' direction, but it appears that he never actually intended to harm her. It would stretch the statute to extreme length to hold that this activity was within A.R.S. § 13–703(F)(3). We do not believe that the finding of the trial judge was correct on this issue.

A.R.S. § 13–703(F)(6) provides that it is an aggravating circumstance if the defendant "committed the offense in an especially heinous, cruel, or depraved manner." This Court has applied this provision of our death penalty statute by looking to the dictionary definitions of the words used. *State v. Knapp*, 114 Ariz. 531, 562 P.2d 704 (1977), *cert. denied*, 435 U.S. 908, 98 S.Ct. 1458, 55 L.Ed.2d 500 (1978). The element of cruelty involves the pain and the mental and physical distress visited upon the victims. Heinous and depraved involve the mental state and attitude of the perpetrator as reflected in his words and actions. *State v. Ceja*, 126 Ariz. 35, 612 P.2d 491 (1980). "Heinous" means "hatefully or shockingly evil; grossly bad"; "cruel" means "disposed to inflict pain esp. in a wanton, insensate or vindictive manner; sadistic"; and "depraved" means "marked by debasement, corruption, perversion or deterioration." *State v. Madsen*, 125 Ariz. 346, 609 P.2d 1046 (1980); *State v. Knapp, supra.*

The sentencing judge found that this aggravating circumstance existed, stating that "The defendant committed the offense of first degree murder in an especially heinous, cruel and depraved manner." We must independently determine whether the state proved any one of these elements beyond a reasonable doubt.

We find that the element of cruelty was not proven. There was no evidence that the victim suffered any pain. It appears from the record that after the injection of heroin the victim lost consciousness and never regained it before she died. Therefore, the victim experienced no pain or mental suffering and the murder was not "cruel" for purposes of A.R.S. § 13–703(F)(6).

The sentencing judge apparently based his finding that the murder was "especially heinous . . . and depraved" on Doris' testimony that appellant strangled the victim while she was totally unable to resist, beat the dead victim about the face and reviled her, dragged the body to the shower stall where it remained for three days, and then wrapped the body in garbage bags and buried it in a shallow grave in a remote area, where wild animals unearthed and devoured the body. In other words, the judge's findings were largely based upon acts which occurred after the victim's death.

Appellant states that the heinous or depraved nature of the crime is determined by the killer's state of mind at or near the time of the offense. *State v. Lujan*, 124 Ariz. 365, 604 P.2d 629 (1979). From this he argues that events surrounding the disposition of the corpse, occurring as they did several days after the killing or even later, cannot be considered in determining whether the crime was heinous or depraved. *See State v. Brookover*, 124 Ariz. 38, 601 P.2d 1322 (1979). We are unwilling to lay down any *per se* rule concerning how near the time of the offense the aggravating acts must take place, because we can imagine hypothetical situations in which a murderer's actions toward the victim's body long after the death could shed light on what the killer's state of mind was when the killing was done. But we are certain that courts may consider the murderer's acts after the victim's death in determining if this aggravating factor exists. *See State v. Ceja*, 126 Ariz. 35, 612 P.2d 491 (1980); *State v. Simants*, 197 Neb. 549, 250 N.W.2d 881 (1977) (defendant killed six people and sexually attacked the three female victims after their deaths; court found depravity).

However, we find that we need not decide whether the appellant's disposing of the victim's body was too long after the commission of the murder to be considered as an aggravating circumstance, because we

believe the events surrounding the murder itself support the trial court's finding that the murder was "especially heinous ... and depraved."

We recently delineated factors to consider in determining whether the offense was committed in a heinous or depraved manner. *State v. Gretzler*, 659 P.2d 1 (1983). One factor we should consider is the infliction of gratuitous violence on the victim. In *State v. Ceja, supra,* the defendant robbed a woman and her husband and shot the couple to death. He continued shooting the victims when it was apparent that they had already been fatally wounded. He then repeatedly kicked the male victim in the face, although the victim was already unconscious or dead. We concluded that this additional gratuitous violence distinguished the murders from the "usual or the norm" of first degree murders and upheld the trial court's finding of heinous and depraved. In the instant case the defendant climbed on top of the dead victim and hit her in the face several times which eventually resulted in additional wounds and bleeding.

Another factor discussed in *Gretzler* is the apparent relish with which the defendant commits the murder. In *State v. Bishop*, 127 Ariz. 531, 622 P.2d 478 (1980), we found the murder was committed in an especially heinous and depraved manner where the defendant killed the victim by striking him repeatedly with a hammer, then tied him up, caused him to fall down a mine shaft and threw rocks on top of him while he was still alive. As the defendant left the scene he turned to his victim and waived saying, "Goodbye, Norman, I hope we never see you again." 127 Ariz. at 534, 622 P.2d at 481. In the case at bar while Jeffers was beating the victim he called her "a bitch and a dirty snitch" and with each striking blow said, "This one is for so and so. [naming several names]." This evidences the relish with which appellant committed the murder. In light of these prior decisions and the *Gretzler* considerations, we find that the remarks made by appellant, while at the same time beating his

victim, establish that the offense was committed in an especially heinous and depraved manner.

In addition appellant urges that § 13–703(F)(6) as construed and applied by this court, is unconstitutional as overly broad. We have addressed the constitutionality of § (F)(6) on numerous occasions. Each element—cruel, heinous, and depraved—has been narrowly defined and construed. This issue was discussed at length in *State v. Gretzler, supra,* and found to meet constitutional standards.

Appellant, citing *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), contends our statute is overbroad because it is read in the disjunctive—cruel, heinous, *or* depraved. We disagree with appellant that our statute becomes unconstitutional merely because we choose to read it in the disjunctive, while Georgia does not. The thrust of appellant's argument is that the disjunctive reading of § (F)(6) would allow an arbitrary imposition of the death penalty since § (F)(6) could apply to any murder. A review of Arizona case law shows this is not true. We have been insistent that the murder be *especially* cruel or *especially* depraved before this section would apply. We have clearly defined the terms and have delineated factors to guide us in determining if the crime was indeed committed in such a manner. *State v. Gretzler, supra.*

Further the case law reveals that § (F)(6) is not applicable to any and all murders, this court has narrowly limited its applicability to cases which stand apart from the norm. *State v. Gretzler, supra, State v. Ceja,* 126 Ariz. 35, 612 P.2d 491 (1980).

## MITIGATING FACTORS

Another contention appellant makes is that the trial court erred in not considering factors in mitigation as well as not finding that such mitigation was sufficiently substantial to call for leniency. The court, urges appellant, should have found as mitigation that he was under the influence of heroin at the time of the murder and that

this drug intoxication markedly impaired appellant's mental state at the time.

There is no evidence to contradict the fact that appellant had ingested heroin on the day of the murder. While intoxication is not a defense, a jury may consider the effects of voluntary intoxication upon an accused's culpable mental state. A.R.S. § 13–503; *State v. Laffoon*, 125 Ariz. 484, 610 P.2d 1045 (1980). However, wholly voluntary acts of a defendant will not excuse his subsequent criminal conduct. *State v. Cooper*, 111 Ariz. 332, 529 P.2d 231 (1974). The record shows the trial court did consider appellant's drug intoxication along with testimony by psychiatrists for appellant and the state. Dr. Gurland, a defense psychiatrist, testified that heroin has the effect of calming people down. Other evidence showed that long-term heroin users like appellant develop a tolerance to the effects of the drug. Doris Van Der Veer testified that appellant had not used an excessive amount of heroin, by appellant's standards, on the day of the murder. The court found that while appellant was drinking and using narcotics the day of the murder there was no credible evidence of any significant impairment of his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law. After reviewing the record we agree with the trial court's findings.

As further mitigation appellant contends his stormy love-hate relationship with the victim raised the classic provocation situation and the crime was induced by the heat of passion. There is nothing in the record which indicates there was an argument or that the crime was induced by heat of passion. Appellant did learn that the victim may have been an informant against him, but this knowledge was gained in late July or early August 1976, months before the October 21 murder. About a week before the killing appellant met with the victim and discussed the possibility that she had been an informant against him. There he also was advised that the victim was now a prostitute and would charge for her sexual favors. Appellant testified that he accepted the situation and that he was not mad.

Even were the victim's actions sufficient to constitute adequate provocation, there was a sufficient lapse of time between the provocation and the killing for the passions to "cool." *See State v. Ramirez*, 116 Ariz. 259, 569 P.2d 201 (1977). The record shows that the trial court did consider this evidence of possible provocation and found that appellant may have had reason to be provoked, that he was under some stress, and may have had motives for killing the victim, but "nothing more."

The third mitigating factor advanced by appellant is the information given to Dr. Gurland, the defense psychiatrist, while appellant was under the influence of sodium amytal, which according to the doctor, was consistent with appellant's innocence. While sodium amytal evidence is not admissible in Arizona courts, *see State v. Thomas*, 79 Ariz. 158, 285 P.2d 612 (1955), *cert. denied*, 350 U.S. 950, 76 S.Ct. 326, 100 L.Ed. 828 (1956), mitigation evidence presented under Arizona's death penalty statute need not meet the normal standards for admissibility.

Both Dr. Gurland and Dr. LaWall, the state psychiatrist, agreed that under certain circumstances a sodium amytal interview can be reliable. Both doctors also agreed that it is not a "truth serum," that persons can lie and fabricate while under the influence of the drug.

The trial court had this medical testimony before it to determine appellant's credibility as well as evidence adduced at trial including appellant's own testimony along with appellant's prior conviction for forgery introduced for impeachment purposes. The record shows the trial court considered all the evidence presented at trial and at the post-trial hearings and found no mitigating factors sufficiently substantial to call for leniency.

We have carefully reviewed the record as required to determine whether the factors

in mitigation outweigh the aggravating circumstances, *State v. Richmond,* 114 Ariz. 186, 560 P.2d 41 (1976), *cert. denied,* 433 U.S. 915, 97 S.Ct. 2988, 53 L.Ed.2d 1101 (1977), and we find they do not.

### CONSTITUTIONAL ARGUMENTS

■ First, appellant asks that his death sentence be set aside because it is disproportionate to the sentence imposed in similar cases. This is not true. Our analysis in *State v. Gretzler, supra,* of the various death penalty cases which have come before this Court, reveals the similarities in the cases in which the death penalty was affirmed. As we discussed in the section on aggravating circumstances, *infra,* the instant case does have similarities to other cases where the death penalty was imposed.

■ Another constitutional attack raised by appellant is that the Arizona scheme for the imposition of the death penalty is unconstitutionally vague. We have addressed this issue many times before with a resolution adverse to appellant. *State v. Gretzler, supra; State v. Watson,* 120 Ariz. 441, 586 P.2d 1253 (1978), *cert. denied,* 440 U.S. 924, 99 S.Ct. 1254, 59 L.Ed.2d 478 (1979).

The ninth circuit has resolved the issue in a similar manner. *Knapp v. Cardwell,* 667 F.2d 1253 (9th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 473, 74 L.Ed.2d 621 (1982).

■ Additionally appellant contends that the reimposition of his death sentence pursuant to *State v. Watson, supra,* is an unconstitutional violation of the following: the due process clause, the ex post facto clause, the double jeopardy guarantees, the prohibition against judicially created penalties, and the guarantee of a republican form of government and a separation of powers. These issues have each been previously determined, again, with a resolution adverse to appellant. *Knapp v. Cardwell, supra; State v. Gretzler, supra.*

We have reviewed the entire record pursuant to A.R.S. § 13–4035 and found no fundamental error. In our independent determination we found one aggravating factor—that the offense was committed in an especially heinous and depraved manner—and no mitigating factors sufficiently substantial to call for leniency. Judgment of conviction and sentence are affirmed.

GORDON, V.C.J., and HAYS, CAMERON and FELDMAN, JJ., concur.