689 P.2d 547

**STATE of Arizona, Appellee,**

v.

**Philip Peter FRUSTINO, Appellant.**

**1 CA–CR 6954.**

Court of Appeals of Arizona, Division 1, Department A.

May 10, 1984.

Reconsideration Denied July 11, 1984.

Review Denied Oct. 10, 1984.

290

Robert K. Corbin, Atty. Gen. by William J. Schafer, III, Chief Counsel, Crim. Div., Gerald R. Grant, Asst. Attys. Gen., Phoenix, for appellee.

John M. Antieau, Phoenix, for appellant.

## OPINION

BROOKS, Presiding Judge.

Appellant filed this appeal from his conviction on one count of collection of extensions of credit by extortionate means, a class four felony in violation of A.R.S. § 13–2304, following a trial by jury. The state filed allegations of prior convictions, and appellant admitted two prior felony convictions. He was sentenced to serve the presumptive term of ten years, with presentence incarceration credit of 130 days, the sentence to be served consecutively to the sentence imposed in Maricopa County Cause No. CR–123829. He timely filed a notice of appeal and raises the following issues:

1. Whether the trial court erred in admitting evidence of another bad act involving a loan which appellant had made to one William Jacox;

2. Whether the trial court erred in refusing to strike testimony concerning the conduct of Mike Malucci;

3. Whether the trial court erred in admitting evidence concerning the amount of interest charged on the loan in this case.

The facts considered in a light most favorable to sustaining the jury verdict are as follows: In August, 1981, the victim, Tresa O'Leo, went to a bar in Phoenix in order to borrow some money. She spoke with the owner of the bar, Harry, and one "Big Mike" Malucci. She first spoke with Malucci about borrowing money inasmuch as one of her friends had borrowed from him before. Harry told her to call appellant, a former cook at the establishment, and gave her his phone number. O'Leo called appellant and told him that she wanted to borrow $700.00. She then went to his

place of business known as the Bird Cage where she met with appellant and three other men. Appellant gave her $700.00 in cash and asked for a check in return. O'Leo gave appellant a blank check which was later filled out with the amount of $770.00. The sum represented the principal plus ten percent interest. Appellant told O'Leo that she would have to pay him $70.00 a week as additional interest until such time as she could pay the full amount of $770.00, and her check would then be returned. She was also told that the $70.00 weekly payments would not reduce the balance of the loan, but were payments to keep the loan "alive". Aside from the blank check, the loan was not documented.

O'Leo returned to the Bird Cage on September 4, 1981, to make her first interest payment. At that time appellant told her that it was not his own money he was lending and that he was glad she was making her payments. He also told her that the people who provided the loan money, "didn't fool around," and that they would, "take anything of value for the $770.00, such as [her] little Bronco or anything of value in [her] house, or could either hurt [her] or the kids, or even get mad enough if [she] didn't pay it, they could blow [her] house up or something like that." O'Leo was frightened and angry following her conversation with appellant.

O'Leo made the $70.00 weekly payments for 12 weeks until December, 1981, when she was hospitalized for four days. Following her hospitalization, O'Leo stayed at home to recuperate for approximately two weeks. During this period of illness, she missed two payments. Appellant called her and asked for the money, telling her he would send someone over to pick it up. O'Leo told him that she would bring the money in herself, but she did not. The following day, Malucci went to O'Leo's home, tore off the screen door and told her to get in touch with appellant right away. Appellant called O'Leo the following day and again demanded his money.

In January, 1982, O'Leo gathered enough money to pay off the loan and went to appellant's place of business. When she arrived, the business was closed and padlocked. She gave the money to a "large man" she saw next door who told her he would give the envelope containing the money to appellant. O'Leo later identified the man in a photographic line-up as Joseph Frank Tocco, and her check was later found during a search of the home of Tocco's girlfriend.

Appellant was charged by indictment with collection of extensions of credit by extortionate means in violation of A.R.S. § 13–2304. The prosecutor filed an amendment to the indictment alleging that appellant had five prior felony convictions. After the jury returned its verdict finding appellant guilty of the offense charged, appellant waived his right to a trial by jury on the prior convictions and admitted two prior felony convictions. He was sentenced to imprisonment for the presumptive term of ten years with credit for presentence incarceration, the sentence to run consecutively to the sentence imposed in CR–123829. He timely appealed his conviction.

## EVIDENCE OF THE JACOX LOAN

Prior to trial, appellant filed a motion in limine seeking to preclude the admission of evidence of a loan made by appellant to one William Jacox. Following argument, the trial court denied the motion. At trial, Jacox testified that in approximately September, 1981, he borrowed $500.00 from appellant at appellant's business. The repayment terms of this loan were that he would pay interest at the rate of $50.00 per week until he could pay the original $500.00. The weekly payments were not to be applied against the principal balance. At the time Jacox borrowed the money, appellant asked him for a blank check, and one was provided by a friend of Jacox. Jacox was to make his $50.00 weekly payments to appellant at appellant's place of business. After Jacox fell behind in his payments, he contacted the Sheriff's Office. Jacox agreed to tape-record conversations between himself and appellant. The deputy sheriff gave Jacox $30.00 to take to

appellant's place of business as a partial payment. After delivering the $30.00 Jacox received a telephone call from appellant. The transcript of that telephone conversation was introduced into evidence at trial. During that phone conversation, appellant told Jacox that the people from whom he had borrowed the money were very "pissed off" at him and that they wanted to go to Jacox's house prior to the phone conversation, but appellant stopped them. Appellant then told Jacox to drop off $10.00 a day to avoid problems. Finally, appellant told Jacox, "cause next time I'm not going to stop them, they're going to just come over there, then you're on your own. You do what you want to do, okay?" Jacox testified that he was upset following this phone conversation. Subsequently, Jacox received a telephone call from a John Kras who informed him that the loan appellant made was really from the money of Joseph Tocco, a/k/a Buddy. Kras told Jacox that Buddy was "madder than hell", that it was his girlfriend's money, that, "these people are not going to fool around", and that if Jacox did not get them their $50.00 he was going to be in a lot of trouble. Kras also told Jacox that the people would beat him (Kras) and then take care of Jacox too.

Both at trial and on appeal, appellant has argued that the evidence concerning the Jacox loan was inadmissible as a prior bad act on three grounds:

1. That A.R.S. § 13–2304 precludes the admission of the Jacox loan;

2. That even if A.R.S. § 13–2304 does not preclude the admission of the loan, evidence of the loan was not admissible under Rule 404(b), Arizona Rules of Evidence, to prove motive, intent or common scheme; and,

3. Even if relevant and admissible, the trial court erred in not excluding the evidence pursuant to Rule 403 because of the prejudice and confusion caused by the admission of the evidence.

## A. ADMISSIBILITY UNDER A.R.S. § 13–2304

A.R.S. § 13–2304(B) provides that in the prosecution of a person charged with collection of extensions of credit by extortionate means:

> [F]or the purpose of showing an implicit threat as a means of collection, evidence may be introduced tending to show that one or more extensions of credit by the creditor were, *to the knowledge of the person against whom the implicit threat was alleged to have been made,* collected or attempted to be collected by extortionate means or that the nonrepayment was punished by extortionate means. (Emphasis added).

A.R.S. § 13–2304(C) makes evidence of the defendant's reputation admissible if "direct evidence of the actual belief of the debtor as to the creditor's collection practices is not available". Appellant argues that because the evidence concerning the Jacox loan did not fit within the exceptions of A.R.S. § 13–2304(B) or (C), it should not have been admitted. He asserts that the statute should be read in conjunction with Rule 404(b). He contends that since the criminal statute specifically defines circumstances under which evidence of other bad acts or reputation can be admitted, the statute clarifies the permissive language of Rule 404(b), and that only those acts which come within the statutory exceptions are admissible. Appellant cites no authority for his proposition.

In order to prove a violation of A.R.S. § 13–2304(A), the state must prove that the defendant has knowingly participated or conspired to participate in the use of, "any extortionate means to collect or attempt to collect any extensions of credit or to punish any person for the nonrepayment thereof". The term "extortionate means" is defined in A.R.S. § 13–2301(A)(4) as, "the use, or an express or implicit threat of use, of violence or other criminal means to cause harm to the person, reputation or property of any person." Therefore, one of the elements of the substantive offense involves an express or implicit threat. A.R.S. § 13–2304(B) makes evidence of other uses of extortionate means known to the victim

admissible in order to establish an implicit threat. A.R.S. § 13–2304(C) renders evidence of the defendant's reputation admissible when there is no available direct evidence of the actual belief of the debtor as to the creditor's collection practices.

■ The threat involved in a collection of an extension of credit by extortionate means may, in numerous instances, be difficult to prove. A statement which appears nonthreatening on its face, such as, "I'll send someone over to collect the money" may be threatening only in light of the creditor's specific prior uses of extortionate means of collection or his reputation regarding his collection practices. It is clear that the legislature recognized that the threat involved in a collection of an extension of credit by an extortionate means is often covert, and that the creditor's past practices constitute, in many cases, not only evidence which is directly relevant, but also, frequently, the only evidence available to establish one of the specific elements of the offense, i.e., the use of extortionate means. We conclude that in drafting A.R.S. § 13–2304(B) and (C), the legislature did not intend to limit the use of evidence which might otherwise be admissible under Rule 404(b).

Rule 404(b) provides:

Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

■ The list of "other purposes" in Rule 404(b) is not exclusive. *State v. Jeffers*, 135 Ariz. 404, 661 P.2d 1105 (1983). A.R.S. § 13–2304(B) and (C) simply set forth some of the "other purposes" for which other crimes, wrongs, or acts may be admitted to establish a violation of A.R.S. § 13–2304(A). Thus, in this case, although the loan to Jacox was not admissible under A.R.S. § 13–2304(B) or (C), the statute did not preclude its admission pursuant to Rule 404(b).

## B. ADMISSIBILITY UNDER RULE 404(b)

Appellant argues, alternatively, that even if A.R.S. § 13–2304 did not preclude the admission of the Jacox loan under Rule 404, the evidence was not properly admitted pursuant to that rule. He contends that evidence of the Jacox loan was not admissible to prove appellant's motive or intent. He argues that neither appellant's motive nor his intent were in question. His contention is based on his conclusion that the culpable mental state of "knowingly" as set forth in A.R.S. § 13–2304(A), makes the offense a general intent crime rather than a specific intent crime. He contends that the only intent required by the offense is the intent to utter the words which generate a fear of harm. He concludes that the act of uttering the words was sufficient in this case to prove the requisite intent, and that appellant's intent was not "in issue"; therefore, the evidence of the Jacox loan was inadmissible.

A.R.S. § 13–105(5)(b) establishes the definition of "knowingly" as follows:

"Knowingly" means, with respect to conduct or to a circumstance described by a statute defining an offense, that a person is aware or believes that his or her conduct is of that nature or that the circumstance exists. It does not require any knowledge of the unlawfulness of the act or omission.

■ In discussing the culpable mental state of "knowingly", our Supreme Court has pointed out that knowledge is implicit in all criminal offenses in the sense that a criminal act must have been voluntary. *State v. Malloy*, 131 Ariz. 125, 130, 639 P.2d 315 (1981). The court concluded that the word, "knowingly" when used in a criminal statute must have an additional meaning, "for the difference in language must have been intended to bring about a difference in result." 131 Ariz. at 130, 639 P.2d 315. Therefore, in order to convict of collection of extensions of credit by extor-

tionate means, the state must prove not only that the creditor knowingly and voluntarily participated in acts constituting the offense, but it must also prove that the creditor was aware that his participation was threatening to the debtor. *See also, State v. Gonzales,* 140 Ariz. 349, 352, 681 P.2d 1368 (1984); *State v. Ramos,* 133 Ariz. 4, 648 P.2d 119 (1982), which refers to the culpable mental state of "knowingly" as a "watered down *mens rea.*" 133 Ariz. at 6, 648 P.2d 119. Further, the legislature, in promulgating A.R.S. § 13–105(5) abolished the distinction between general intent and specific intent crimes in Arizona. Therefore, in this case, the state was required to prove appellant's intent. The evidence of the loan to Jacox was probative and properly admitted to prove that appellant acted knowingly.

■ Appellant contends that if the Jacox loan was admissible to show intent, the trial court then erred in failing to instruct the jury on the essential scienter element of the crime. We disagree. The record shows that the trial court properly instructed the jury on the definition of "knowingly".

## C. ADMISSIBILITY UNDER RULE 403

■ Finally, appellant contends that even if the evidence of the Jacox loan were relevant and admissible, the trial court should have excluded it pursuant to Rule 403, based on the prejudice and confusion caused by the admission of the evidence. Appellant has not pointed out any unfair prejudice or confusion on the part of the jury resulting from the admission of the evidence. The question of the admissibility of evidence under Rule 403 is left to the sound discretion of the trial judge, and we find no abuse of discretion in this case. *State v. Rose,* 121 Ariz. 131, 136, 589 P.2d 5 (1978). The Jacox loan occurred just prior to the loan in the instant case. The terms of the Jacox loan were almost identical to the terms of the O'Leo loan. Appellant's conduct with regard to the Jacox loan was not of such a depraved nature as to outweigh its relevance with prejudice. *State*

*v. Rose,* 121 Ariz. at 136, 589 P.2d 5. We find that the trial court did not err in admitting the evidence of the Jacox loan.

## TESTIMONY CONCERNING MIKE MALUCCI

Appellant next contends that the trial court erred in admitting testimony concerning the conduct of Mike Malucci. After the victim was behind in her payments, Malucci went to her house, tore her screen door and told her to get in touch with appellant right away. Appellant contends that the state failed to establish the necessary foundation to admit evidence concerning Malucci's conduct under the co-conspirator exception. The state has argued both in the trial court and on appeal, however, that the evidence was admissible under Rule 801(d)(2)(C) as an authorized admission or Rule 801(d)(2)(D) as a statement by an agent. In reply to this argument, appellant contends that the state failed to establish sufficient foundation for the admission of the statement.

■ Pursuant to Rule 801(d)(2)(C) statements made by a person other than a party opponent are deemed admissible if they are authorized by the party opponent. Such statements are excluded from hearsay. The authorization may be implicit in the evidence. M.K. Udall and J.M. Livermore, *Law of Evidence* § 125 at 259 (2nd ed. 1982). Rule 801(d)(2)(D) excludes from hearsay a statement by the agent of a party opponent "concerning a matter within the scope of his agency ..., made during the existence of the relationship". In order for a statement to be admissible pursuant to either rule, there must be independent proof of an agency relationship and its scope. *Law of Evidence* § 125 at 261; 4 *Weinstein On Evidence* ¶ 801(d)(2)(C) and (D)[01]. This is a matter of substantive law of agency. The Restatement (Second) of Agency § 285 provides:

Evidence of a statement by an agent concerning the existence or extent of his authority is not admissible against the principal to prove its existence or extent, unless it appears by other evidence that

the making of such statement was within the authority of the agent, or as to persons dealing with the agent, within the apparent authority or other power of the agent.

■ Although we acknowledge that this is a close case, we nevertheless hold that there was sufficient independent proof of an agency relationship. Evidence was presented to establish that Malucci was present when O'Leo first attempted to procure the loan. Malucci knew that Harry had sent the victim to see appellant. Evidence was introduced to show that Malucci had attempted to collect a debt owed by a friend of O'Leo by going to O'Leo's house and tearing her screen door on an earlier occasion. Finally, and most important, appellant told O'Leo that he was sending someone to see her about her delinquent loan payments. O'Leo had no other outstanding debts, and the next day Malucci arrived at her house tore her screen door and told her to call appellant. We find that the evidence provided a sufficient foundation for the admission of Malucci's visit as either an authorized statement pursuant to Rule 801(d)(2)(C) or the statement of an agent pursuant to Rule 801(d)(2)(D).

■ Appellant also contends that O'Leo was not a "reliable informant" for purposes of establishing the relationship between Malucci and appellant. He argues that because she was impeached, her testimony was not credible and therefore could not provide the independent proof of an agency relationship between Malucci and appellant. At trial, appellant elicited evidence that O'Leo had previously told defense counsel that she had borrowed money to pay back the loan from friends, and then later testified that she had obtained the money to repay the loan from her profit sharing withdrawal. However, O'Leo explained the inconsistencies at trial by pointing out that she did not believe it was defense counsel's business where she had obtained the money. She informed the prosecutor prior to trial that she had obtained the money from her profit sharing withdrawal, and that she had lied on the previous occasion. The matter of the credibility of evidence tending to establish independent proof of an agency relationship before statements may be admitted pursuant to Rule 801(d)(2)(C) or 801(d)(2)(D) is addressed to the trial court's discretion, and we will not reverse the trial court's determination in the absence of an abuse of discretion. We find no abuse here, and conclude that the statements concerning the activities and statements of Mike Malucci were properly admitted into evidence.

### EVIDENCE CONCERNING THE RATE OF INTEREST

■ For his final issue, appellant contends that the trial court erred in admitting testimony concerning the high interest rate on the loan made by appellant to O'Leo in this case. We disagree. Rule 401, makes evidence relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

The charge in this case arose out of the loan made by appellant to O'Leo. The terms of the loan were relevant to a full understanding of the offense. The interest rate charged by appellant was one of those terms and the evidence was necessary to "complete the story" of the offense. *See State v. McCall,* 139 Ariz. 147, 677 P.2d 920 (1983); *State v. Starcevich,* 139 Ariz. 378, 678 P.2d 959 (Ariz.App.1983). We find no error.

For the foregoing reasons, the judgment of conviction and the sentence imposed are affirmed.

GRANT and CONTRERAS, JJ., concur.