NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

STEFANO ROBERT HART, *Appellant.*

No. 1 CA-CR 25-0243

FILED 06-04-2026

Appeal from the Superior Court in Maricopa County
No. CR2024-126721-001
The Honorable Max H. Covil, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Joshua C. Smith
*Counsel for Appellee*

Maricopa County Public Defender's Office, Phoenix
By Mikel Steinfeld
*Counsel for Appellant*

---

**MEMORANDUM DECISION**

Judge Andrew J. Becke delivered the decision of the Court, in which Presiding Judge Samuel A. Thumma and Judge Kent E. Cattani joined.

---

**B E C K E**, Judge:

¶1 Defendant Stefano Robert Hart appeals his convictions and sentences for aggravated assault, assault, and criminal damage. For the following reasons, we affirm.

## FACTUAL AND PROCEDURAL HISTORY

¶2 On June 3, 2024, Phoenix police responded to a 911 call from a woman stating her apartment front door had been kicked in. Dispatch heard "what sounded like a physical struggle or screaming" and the woman yelling "stop" and "he's going to hurt me." Upon arrival, police observed the front door was closed, but the doorjamb was "completely splintered" and the locking mechanism had been broken off. From outside the door, police heard a woman screaming and pleading for help from upstairs. Police announced their presence and ordered everybody to vacate the apartment, but the screaming continued and no one exited the premises.

¶3 Police entered the apartment, and in the upstairs master bathroom, saw Hart grabbing Lauren (a pseudonym) with one hand and pouring bleach on her with the other. Police ordered Hart to stop, he complied, and they took him into custody. Lauren was "hyperventilating, crying" with red eyes and a flushed face. Police also observed bruising on Lauren's forehead. Lauren later played a video recording from her front doorbell camera for police, showing Hart demanding a cellphone and forcing his way through the door. Police also saw a laptop broken in half, a hole in the wall in the master bedroom, and a broken closet door handle in the master bathroom.

¶4 Three hours later, Lauren underwent a Sexual Assault Nurse Examiner examination at an advocacy center. During the examination, Lauren vomited and told the forensic nurse she was "very dizzy" and did not feel well. The forensic nurse ended the exam, called 911, and paramedics arrived. Based on Lauren's vitals and her narrative of the

attack, paramedics transported her to an emergency room for treatment by a doctor.

¶5        Hart was indicted for one count of aggravated assault, a class four felony; one count of assault, a class one misdemeanor; and one count of criminal damage, a class one misdemeanor. The aggravated assault was charged under A.R.S. § 13-1204(B), which requires proof both that Hart was in a domestic relationship with the victim and that he "intentionally or knowingly impede[d] the normal breathing or circulation of blood . . . by applying pressure to the throat or neck or by obstructing the nose and mouth . . . ." *See* A.R.S. §§ 13-1204(B), -3601(A).

¶6        The State filed a pretrial motion seeking to admit "any and all non-testimonial statements made by [Lauren] for medical diagnosis or treatment following the . . . assault." *See* Ariz. R. Evid. 803(4) ("A statement that . . . is made for—and is reasonably pertinent to—medical diagnosis or treatment; and . . . describes medical history; past or present symptoms or sensations; their inception; or their general cause" is not excluded by the rule against hearsay.). Hart did not respond or otherwise object and the superior court granted the motion. Although subpoenaed to attend trial, Lauren did not do so, and her testimony was not provided to the jury.

¶7        On the third day of trial, the ER doctor, the paramedic, and the forensic nurse testified. At the start of his testimony, the ER doctor explained he relies on information obtained from others, which can include nurses, medical technicians, and other doctors. He also explained that he relies on information provided by the patients themselves. The State then asked what Lauren told him during her visit and Hart objected on hearsay grounds. The Court overruled the objection, citing its earlier ruling on the State's pretrial motion.

¶8        The ER doctor then testified that Lauren stated she had experienced domestic violence, was placed in a choke hold and lifted two feet in the air, causing her vision to go black, and that she had a seizure during the attack. The ER doctor further testified Lauren reported neck pain and a severe headache. When questioned about the type of strangulation Lauren reported, the ER doctor clarified that his own report did not identify how Lauren was strangled but that the ER nurse's report stated: "Patient states [she] was choked with forearm of her ex-partner and lifted 2 feet off the ground and then had a seizure."

¶9        During direct examination of the paramedic, the State tried to elicit testimony about what Lauren said when the paramedic asked her

what happened. Defense counsel objected on hearsay grounds and the superior court again overruled the objection. The paramedic then testified that Lauren reported "she was choked with an arm around her neck" and simultaneously "struck multiple times with a closed fist."

¶10　　　　Without objection, the forensic nurse testified that Lauren reported she was "hit multiple times" and choked in a headlock from behind which "lifted her up," that she experienced a stress-induced seizure while "wrestling to the ground," and that she had bleach poured all over her. The forensic nurse added that Lauren reported pain in her neck and throat, and that after the strangulation, her voice was "raspy," and it was painful to speak. The forensic nurse also testified about her personal observations including petechiae (ruptured blood vessels) in Lauren's eye, a sign and symptom consistent with strangulation, and abrasions and contusions on Lauren's arm, neck, chest, and temple.

¶11　　　　On the fourth day of trial, before defense counsel began his cross-examination of the forensic nurse, the State moved to reopen direct examination to ask the forensic nurse if Lauren reported the identity of her assailant during her examination. The State argued the information was covered by the pretrial motion previously granted without objection for hearsay statements allowed under Rule 803(4).

¶12　　　　The superior court declined to reopen direct examination but clarified that, depending on what was asked during cross-examination, the State would be permitted to ask on redirect if, based on the report, the forensic nurse "had any inclination as to what the relationship was between [Lauren]" and the assailant. Defense counsel did not elicit testimony concerning the forensic nurse's knowledge of Lauren's relationship with her assailant during cross-examination. The court asked defense counsel if he intended to cross-examine the forensic nurse on the checked box indicating a relationship with the assailant, and defense counsel stated he did not intend to do so and that he did not object to the State eliciting that testimony. The State then asked the forensic nurse on redirect examination if Lauren reported what kind of relationship she had with the person who attacked her. The forensic nurse answered that Lauren reported it was a "dating relationship."

¶13　　　　The State also played two phone call recordings between Hart and Lauren to establish their domestic relationship and to explain Lauren's absence. In the first phone call, Lauren tells Hart, "I'm never going to leave you" and Hart asks Lauren, "Do you know that I love you?" and shortly after, states that he loves her. On the second phone call, the jury heard Hart

explain a situation where a man committed domestic violence against a girl, who later went missing and "they didn't hear nothing from her." Hart explains the man may have sat down with her and tried to get her to write an affidavit to say that she was under emotional distress and lied about the assault because the man cheated. Hart then asks Lauren, "Do you get what I'm saying? Do you get where I'm going?" Hart then tells Lauren not to go to court.[1]

¶14      At the close of the State's case-in-chief, Hart moved for a judgment of acquittal under Arizona Rule of Criminal Procedure 20. Hart argued the State failed to present evidence showing "choking" and "who caused the criminal damage." Hart also argued Lauren's absence and "the medical reports being allowed by the hearsay exception"[2] required a judgment of acquittal. The superior court found there was enough evidence to submit the case to the jury and denied his motion.

¶15      The jury found Hart guilty as charged and found aggravators for each count. For count one, the superior court sentenced Hart to the minimum term of eight years in prison with 351 days of presentence incarceration credit. For counts 2 and 3, the court sentenced Hart to "time served." Hart timely appealed and we have jurisdiction pursuant to Article 6, Section 9 of the Arizona Constitution and A.R.S. §§ 12-120.21(A)(1), 13-4031, and -4033(A)(1).

---

[1] The State makes no argument on appeal that Lauren's hearsay statements were separately admissible under Ariz. R. Evid. 804(b)(6), which creates a hearsay exception for "statement[s] offered against a party that wrongfully caused—or acquiesced in wrongfully causing—the declarant's unavailability as a witness, and did so intending that result." In light of that omission and our resolution of this appeal, we do not address that issue.

[2] Hart made no Confrontation Clause objection to this testimony, U.S. Const. amend. VI; Ariz. Const. art. II, § 24, and raises no such argument on appeal.

## DISCUSSION

### I. Hart Argues the Admission of Hearsay Testimony on the Assailant's Identity was Error.

¶16 Hart argues the superior court erred in admitting two hearsay statements that identified Lauren's assailant. Hart takes issue with (1) the ER doctor's testimony based on an ER nurse's report that Lauren stated she "was choked with [the] forearm of her ex-partner and lifted [two] feet off the ground" and (2) the forensic nurse's testimony that Lauren reported to her she was in a "dating relationship" with the assailant. Hart properly objected at trial, and so we review the admission of the two statements for harmless error. *State v. Henderson*, 210 Ariz. 561, 567, ¶¶ 18–19 (2005). "Harmless error review places the burden on the state to prove beyond a reasonable doubt that the error did not contribute to or affect the verdict or sentence." *Id.* at ¶ 18.

¶17 Hearsay is an out-of-court statement that "a party offers in evidence to prove the truth of the matter asserted." Ariz. R. Evid. 801(c). Hearsay is not admissible unless otherwise allowed by an exception. Ariz. R. Evid. 802. One exception is a statement made for and reasonably pertinent to medical diagnosis or treatment and that "describes medical history; past or present symptoms or sensations; their inception; or their general cause." Ariz. R. Evid. 803(4).

¶18 Hart argues statements identifying the alleged assailant are neither reasonably pertinent to medical diagnoses or treatment nor "describe medical history, symptoms or sensations, their inception, or general cause." Hart cites to *State v. Jeffers*, 135 Ariz. 404 (1983) in support of his argument.

¶19 In *Jeffers*, our supreme court spelled out a two-part test to decide whether a statement fit in Rule 803(4)'s exception.[3] 135 Ariz. at 420–21. Courts look at "(1) whether the declarant's motive is consistent with receiving medical care; and (2) whether it is reasonable for the physician to rely on the information in diagnosis or treatment." *Id.* The supreme court held a victim's statement to an ER nurse about who drugged her failed to

---

[3] *Jeffers* interpreted an older version of Arizona Rule of Evidence 803. Rule 803 was reworded in 2012 to conform to the federal restyling of the rules. *See* Ariz. R. Evid. 803 cmt. to 2012 amendment. However, the restyling was "stylistic only," and there was "no intent in the restyling to change any result in any ruling on evidence admissibility." *Id.*

satisfy either prong of the test. *Id.* at 421. The Court relied on *United States v. Iron Shell*, 633 F.2d 77 (8th Cir. 1980), which noted that statements concerning what happened are pertinent to diagnosis and treatment, while those concerning who assaulted someone are "seldom, if ever, . . . sufficiently related." *Id.* at 84.

## II.     The State Argues the *Robinson* Exception Should Include Domestic Violence.

¶20     Although conceding Rule 803(4) generally does not include statements of identity, the State argues Arizona case law created an exception to this rule in *State v. Robinson*, 153 Ariz. 191 (1987), and that the exception should apply here.

¶21     In *Robinson*, our supreme court held an assailant's identity is relevant in child sexual abuse cases because "the abuser's identity *is* critical to effective diagnosis and treatment." 153 Ariz. at 200 (emphasis in original). "The exact nature and extent of the psychological problems which ensue from child [sexual] abuse often depend on the identity of the abuser." *Id.* (alteration in original) (quoting *United States v. Renville*, 779 F.2d 430, 437 (8th Cir. 1985)). For example, the psychological consequences of sexual abuse by a father may differ and require different treatment than abuse by a stranger. *Id.* And such treatment may require the child to avoid contact with the abuser to prevent further harm and "facilitate recovery from past abuse." *Id.*

¶22     The State argues this same logic applies to domestic violence offenses involving adults and cites to a recent memorandum decision as persuasive authority. *State v. Fairchild*, 2 CA-CR 2022-0164, 2024 WL 3579461, at *3, ¶ 10 (Ariz. App. July 29, 2024) (mem. decision) ("And as in child sex abuse cases, medical providers treating domestic violence victims must identify the abuser to counsel the patient in the practical steps necessary to prevent further injuries and allow the current injuries to heal.")

III.    **Any Error in Admitting Testimony Concerning the Assailant's Identity Was Harmless.**

¶23    We need not decide if the *Robinson* child abuse exception applies in domestic violence cases because any alleged error was harmless. Hart argues the State relied on the hearsay evidence to establish the identity[4] of Lauren's assailant and the domestic relationship required for the aggravated assault conviction. Hart does not argue the hearsay evidence affected the underlying findings that Lauren was strangled and assaulted or that Lauren's property was damaged.

¶24    But there is no real question as to who assaulted Lauren. The State presented video evidence from Lauren's doorbell camera showing Hart breaking down her front door the day of the assault. Just before police witnessed the assault, they heard Lauren screaming and crying for help. Captured on body camera footage and confirmed by officer testimony, police walked in on Hart *actively* assaulting Lauren, holding her and pouring bleach on her. Notably, Lauren's description of her assault to the forensic nurse included her assailant *pouring bleach* all over her, choking her, and hitting her multiple times. Police observed a broken laptop, damage to the master bedroom wall, the front door and a closet immediately following the assault.

¶25    There was also no question as to the nature of Lauren's relationship with Hart. The State played Hart and Lauren's recorded jail phone calls with each other for the jury. During those calls, they declared their love for each other and Lauren promised Hart that she would never leave him. In a second phone call, the jury heard Hart telling Lauren not to come to court. Hart also told Lauren he knew a man who committed domestic violence against a woman, but the man had this woman write an affidavit stating she lied about the assault because she was devasted by the man's cheating. Hart then implied Lauren should do the same.

¶26    Despite the State mentioning the hearsay statements in its closing argument, given the brevity of the ER doctor's and forensic nurse's testimony contrasted with the overwhelming admissible evidence showing Hart did the acts, no reasonable juror could conclude the assault was committed by anyone other than Hart or that Lauren was not in a domestic relationship with Hart. *See State v. Brown*, ___ Ariz. ___, ___, ¶ 52, 577 P.3d

_____

[4] Neither the ER doctor nor the forensic nurse used Hart's name nor pointed him out in court.

14, 25 (2025) ("In essence, the state must demonstrate that even with the error, no reasonable jury could have found that the state failed to prove its case beyond a reasonable doubt."); *see also Henderson*, 210 Ariz. at 567, ¶ 18. The properly admitted evidence "presents a body of proof, firmly convincing on the essential facts" showing the jury would have convicted even without the error. *State v. Copeland*, 253 Ariz. 104, 116, ¶ 27 (App. 2022) (cleaned up). To the extent that the court erred in admitting the ER doctor's and forensic nurse's statements identifying Hart as the assailant, any such error was harmless beyond a reasonable doubt.

## CONCLUSION

¶27        We affirm.



**MATTHEW J. MARTIN • Clerk of the Court**
**FILED**:        JR